# Court of Appeals.

November 22, 1898.

## PEOPLE v. MICHAEL COREY.

**1. CRIMINAL LAW—DELIBERATION.**

. If it appears that a man charged with murder in the first degree armed himself with a deadly weapon before making the fatal assault, it points . strongly towards "a deliberate and premeditated design to effect the death of the person killed;" but it is quite different if he first makes an assault with his fist, and during the struggle that follows seizes a weapon ready to his hand, and at once inflicts a mortal wound with it, for both the shortness of the time and excitement of the occasion make it much less probable that he acted with deliberation, as it is known in the criminal law.

**2. SAME—THREATS.**

Previous threats and subsequent declarations as to his intention have an important bearing upon what was passing through his mind just before he inflicted the fatal injury.

**3. SAME—CONFLICTING EVIDENCE.**

Where there is a conflict in the evidence and opposing inferences may be drawn from the facts, the court of appeals will not set aside the verdict for error of fact.

**4. SAME—STATEMENT OF EVIDENCE.**

It is error for the trial judge, even inadvertently, to state incorrectly his own recollection as to a material fact.

**5. SAME.**

It is not proper for the court to tell the jury what the witness had sworn to upon the previous trial, when there was no evidence that she had so sworn.

**6. SAME—DYING DECLARATIONS.**

The Code of Criminal Procedure, though in prescribing the rights of a defendant in a criminal action, it provides that he is entitled "to be confronted with the witnesses against him in the presence of the court," except in certain cases was not intended to abolish the rule governing the admission of dying declarations.

**7. SAME.**

The deceased is not a witness, within the meaning of such a provision or of the bill of rights, and it is sufficient if the defendant is confronted with the witness who testifies to the declaration.

**8. SAME—CHARGE.**

A charge to the jury upon the subject of dying declarations that "it is the experience of mankind that the premonition of immediate death,

from which there is no hope of recovery, is always sufficient to influence persons so situated to speak the truth," is erroneous.

**9. SAME.**

It is error for the court, in submitting to the jury the credibility of a witness in a general way, not to mention a threat which is of great importance, in that it indicates a strong bias against the defendant, though, in response to a request made, he does not decline to charge further upon the subject than he has already charged, but virtually states that he has called the attention of the jury to every fact that they have a right to take into consideration as affecting his credibility.

**10. APPEAL—COURT OF APPEALS.**

The court of appeals is authorized to order a new trial when it is satisfied that the verdict is against the weight of evidence or against law, or that justice requires a new trial, even if no exception was taken in the court below.

APPEAL from a judgment, convicting the defendant of murder in the first degree, and from an order denying a motion for a new trial.

Albert O. Briggs and John E. Smith, for appellant.

M. H. Kiley, District Attorney, for the People.

VANN, J.—The defendant was indicted for the murder of James George, an Indian, on the 27th of September, 1894, at the house of Orson Webb, in the town of Eaton, Madison county. This house was a shanty, 12 or 13 feet by 16, rudely built of boards nailed to four posts set in the ground, and covered with the same material. It had no cellar or foundation, and the rough plank floor had numerous apertures. There was but a single room, with no partitions, but one door, which was on the south side, and near the south west corner, and but one window, which was on the west side. The structure was situated in the woods, remote from a highway, and was reached by a path leading through a pasture. At the time of the affray an old stove stood opposite the door, and in the northwest corner was a cupboard made of rough boards. On the south side of the room, and about four feet east of the door, was a shelf, near which was a butcherknife belonging to James George, thrust in a crack; and on the shelf was a common pocketknife, with two

blades, which belonged to one of Webb's children. A table, some chairs, and two or three old beds resting on the floor, without bedsteads, completed the furniture. The beds consisted of straw ticks covered with soiled and ragged bedclothing, and the room and all things in it, including the people, were described by a physician as extremely filthy. In this room Orson Webb, Sarah, his wife, his two daughters, Susan and Libbie, aged respectively 16 and 18, and four younger children, besides James George and the defendant (ten human beings in all); lived and slept. These persons, with Cora Bennett, a niece of Mrs. Webb, were present when the crime in question is alleged to have been committed.

The defendant was attached to Susan Webb, and had some feeling towards George on account of his attentions to her. Each had recently made threats against the other on her account, although they had slept together, and had worked together in peace that fall. The threats made by George, although less frequent, were not less significant than those made by the defendant; for, but three or four days before the tragedy, he said that, if the defendant did not keep away from his girl (Susie Webb), he would cut his heart out with the knife that he held in his hand at the time. About three hours before the affray the defendant accepted the invitation of George to eat supper with him, and the two men ate and talked together as friends. During the afternoon Webb and the defendant had been engaged in erecting a woodshed in the form of a lean-to, and banking up the shanty for winter. They had a jug of beer, which was consumed by them, with the help of Cora Bénnett and Susan and Libbie Webb. After supper, Susan suggested that they have something more to drink, and gave her father a dollar to go and get it. He went nearly two miles and back, and returned about 8 o'clock in the evening with another jug of beer, containing a gallon, and two pints of whisky. During his absence, Susan obtained from the pocket of George's coat, upon his suggestion, a pint of alcohol, which, after being diluted with water, was drunk by George, the defendant, and the girls. Half of the beer and whisky procured by Webb was drunk by the same persons, aided by Mrs. Webb. While every person

in the room except Webb and the younger children was more or less intoxicated, the defendant and George drank the most, and the latter was the most affected. The party alternated in drinking beer and whisky, dancing during the interval to the music of Webb's violin ; the two men being in their shirt sleeves. When Webb returned with the beer and whisky, Libbie was already asleep on one of the beds on the floor, and, as no explanation of the fact was given, it is not difficult to infer why she was overcome by sleep at that early hour. No partners were taken nor sets formed for the dance, which was described as a jig or skirt dance, and was performed by " jumping about and dancing around." After thus drinking and dancing for an hour or more, the orgies culminated in the transaction which is the subject of this appeal. Shortly after 9 o'clock Cora Bennett and Susan were sitting or lying on a bed on the south side of the room, and George was sitting beside them. The defendant was sitting in a chair on the west side of the room, south of the window, and Webb and his wife sat north of him. A lamp on the table furnished the only light. Webb testified that the defendant said to George, " Why can't you get up and sit in a chair, and not be sitting there on the floor ? " and that George replied, " I am doing no hurt here," but finally got up and began to dance with the little girl, Mary. After dancing a short time he crossed over to the west side of the room, where the defendant was sitting, had some words with him went to the shelf, and stood there with Susan, when the defendant, who was still seated, asked him.   " What are you doing there, talking to that girl ? " George replied, " Ain't I a right to talk to this little girl ? " whereupon the defendant said, " No," jumped towards George, and struck at him ; but George pushed him off, and the defendant " dodged down to get under his arm," which was raised, and struck him six or seven times in the side.

Mrs. Webb swore that during the evening the defendant told her that he did not like the Indian, and that he would have trouble with him ; that later, after the two men had had some words, the defendant jumped up and struck at George, who " guarded his blow off and knocked him back up against the door, and he came back again ; and I did not see what he had

in his hand, but he made a motion seven or eight times at his side." Susan Webb stated that, when the defendant spoke to George about sitting on the bed with the girls, George started to get up, but, apprehending trouble, she took hold of his arm, told him to sit down and not have any fuss, whereupon he became quiet. Shortly after that, George went over to the other side of the room, and then came back to the shelf, while the defendant remained on the west side. The two men had some words, when the defendant arose from his chair and jumped towards George, who knocked him back against the door, whereupon she saw the defendant make motions towards George as if stabbing him. No other eye-witness of the affray was sworn, and the failure to call Cora Bennett was not accounted for, except by the suggestion of the defendant's counsel, that she was confined in a penal institution. The butcherknife was not disturbed, and no one saw either of the men take the other knife from the shelf; but it was seen there just before George passed from the west side of the room to the shelf, and was not seen afterwards. The defendant was not seen by the shelf, after the knife was last seen upon it, until he jumped towards George and was knocked against the door. The evidence tended to show that the defendant's shirt and trousers were badly torn on the occasion. The next morning one of his eyes was somewhat swollen, and there was a cut over it from a quarter to a half an inch in length. No one saw the knife in the defendant's hands at any time, but after he had made repeated motions towards George, as if stabbing him, George sank to the floor ; and the defendant kicked at him, and went out of doors. Webb, upon discovering that George had been stabbed, followed the defendant out and asked. "What did you do with the knife that you cut Jim with?" and the defendant replied, "I threw it back into the bushes. I only stabbed him with the little blade. It is only a flesh wound. He will get over it." He also said, according to Webb's statement, "When I fight with a man I calculate to whip that man, if I have to kill him." Webb returned to the house, and upon examining George, found eight wounds, apparently made with the blade of a knife, upon the left side of his body. Six days later George died. The defendant, upon

leaving the house, went to an adjoining farm, where he had worked, and stayed all night. The next day, when asked by an acquaintance where he got that cut over the eye, he replied that he got into a fight at Webb's the night before, and stabbed an Indian three or four times. He was then told that he had got himself into a scrape, whereupon he left for the city of New York, where he formerly resided. While there he wrote a letter to Susan Webb, in which he said: "Susie, I can't tell you how sorry I am for getting in that trouble and having to leave you; but you are as much to blame as I am, for, if you had not carried on the way you did that night, I would not have got a-fighting with that God damned Indian; but never mind; it may be all for the best, Susie. After I had the trouble that night, I went down to Ira Spaulding's, and stayed there till morning and was going to go to work for him that day, but I was afraid Jim would get a warrant out for me; so I made up my mind the best thing I could do was to come to New York until it would blow over. * * * Remember, Susie, I love you with all my heart, and shall never forget the way you treated me; let it be good or bad, I cannot help but love you. Remember, also, that I told you that I would kill any one that ever tried to come between us, and so, Susie, so help me God, I will; and that is why I cut Jim with that knife. I meant to kill him, and will, if he ever comes monkeying around again while I am there." Not long after, on being arrested, he asked if George was dead yet, and was told, No," when he replied, " Well, if he ain't, he ought to be."

Eight incised wounds, such as could have been made by a large or the small blade of an ordinary pocketknife, were found on the body of George, only one of which was fatal, and that not necessarily so. The wound of deepest penetration was less then two inches in depth, so that either the small blade or slight force must have been used in making the wounds. Death resulted from blood poisoning caused by the formation of pus in the pleural cavity, which was not withdrawn, owing to the unsanitary condition of things in the Webb house, and the danger of the operating without antiseptic precautions. George was a strong, healthy, well-developed man, somewhat given to

quarreling, especially when under the influence of liquor.   Six witnesses, acquainted with his reputation, swore that it was that of a quarrelsome, fighting man.   Four records of the court of special sessions were read in evidence, showing that he had been convicted for drinking and fighting.   The defendant had a horrid disease, was not as strong as George, and was usually quiet and peaceable.   On three occasions he had received somewhat severe injuries on the top of the head, one resulting in a fracture of the skull, which left scars and a depression, with tenderness under pressure.   Several medical experts, answering a hypothetical question, testified that in their opinion he was insane at the time of the affray, but the weight of medical testimony was the other way.   Several witnesses, including two justices of the peace, testified that the character of Orson Webb for truth and veracity was bad, and that they would not believe him under oath; but he was sustained by an equal number of witnesses, who apparently knew his reputation equally well. He was once convicted and suffered imprisonment for assault and battery, and was once convicted, upon his own confession, for petit larceny, but was not punished.

The character of the inmates of the Webb house, who were the only witnesses to give the history of the transaction, the condition of some of those witnesses when they saw the affray, the disposition of George to quarrel and fight when under the influence of liquor, the intoxication of both participants when the affray began, the fact that violence was used by each towards the other, the absence of any weapon when the trouble began, the nature of the weapon used, and the confusion in the minds of eyewitnesses as to what actually took place, are important facts to be borne in mind in reviewing this case.   The evidence warranted the jury in convicting the defendant of murder in the first degree, as there was some time for deliberation; still, the facts already mentioned leave that essential feature without the support that it might have had, if the witnesses and participants had been persons of a different character and in a different condition.   While the defendant was the aggressor when he sprang towards George and struck at him, there is no evidence that he then struck with a weapon, or with anything

except his fist. The blow was promptly returned by George, who knocked the defendant against the door, and from that instant until the end of the affray the time was very short. While it was long enough for sufficient deliberation to stamp the crime as murder in the first degree, it does not follow that because there was time enough to deliberate there was in fact deliberation. The two drunken men exchanged blows, the defendant striking first, but the blow of the other man being the most effective. Up to this time there was no opportunity for the defendant to get hold of the knife, yet almost instantly he was plunging it into the side of his victim. Whether he snatched it from the shelf or from the hand of George, who had had an opportunity to get it, cannot with certainty be told. Whether it was open or shut when his hand first clasped it is not known. Whether the fatal wound was the first or the last inflicted is not disclosed. The solution of these questions would reflect much light upon the fundamental question of deliberation, yet they cannot be solved from the evidence before us. It it appears that a man charged with murder in the first degree armed himself with a deadly weapon before making the fatal assault, it points strongly towards " a deliberate and premeditated design to effect the death of the person killed "; but it is quite different if he first makes an assault with his fist, and during the struggle that follows seizes a weapon ready to his hand, and at once inflicts a mortal wound with it, for both the shortness of the time and the excitement of the occasion make it much less probable that he acted with deliberation, as it is known in the criminal law. Still, previous threats and subsequent declarations as to his intention have an important bearing upon what was passing through his mind just before he inflicted the fatal injury. As there was a conflict in the evidence, and opposing inferences might be drawn from the facts, we do not feel warranted in setting aside the verdict of the jury for error of fact; and we proceed to consider the alleged errors of law.

Mrs. Webb, during her cross-examination, testified that she thought the shirt worn by the defendant was badly torn on the occasion in question ; that she had recently washed it, and it was not then torn ; that she saw him wearing it during

the evening, and did not see that it was torn, but after the affray she observed that both sleeves were torn, and that the shirt was torn in other places, including the side and under the arms. She was then asked by the defendant's counsel : "You know it was torn right there in that quarrel,—in that fight ? A. I that most of it was torn in that way. Q. Did you see this man George after he had struck Corey ? Did you see where he grabbed him,—whether by the sleeves or by the bosom ? (Objected to. Objection sustained.)" But the witness answered : " I didn't notice. Q. Did you observe? A. No, sir. (Objected to as incompetent and immaterial. Objection sustained.) Q. Did you observe whether he grabbed him or not? A. No. sir; I didn't. Q. You didn't observe ? A. No. sir. * * * Q. You didn't observe just whether Mr. Corey grappled onto a hold of this man,—you didn't observe, did you ? A. No, sir. * * * Q. You say you didn't observe whether he grabbed him or not? (Objected to.) A. No, sir; I didn't." The court then remarked to counsel, "If you are simply talking loud to drown it, she certainly said that he didn't grab him a all," and, turning to the witness, asked, "How do you understand it ? " and she answered, " He asked if I knew whether he grabbed or not." The court then, turning to the jury, asked, " Did you hear her say that he didn't grab him at all ? Did you hear that, any of you ?" and a juror answered, " I heard that." Upon being further cross-examined, the witness testified that she saw George strike the defendant and knock him back against the door, or against the west side of the house, and subsequently she was asked : " Now, did somebody suggest to you that you keep back this idea that George struck Corey, and that before the former trial,—that you not tell of that ? A. No; I think I told it here, didn't I ? Q. Didn't some one tell you that you could keep that back ? That is the fact about it, isn't it, Mrs. Webb ? A. I. belive there was a person said I wasn't obliged to swear to that, unless I had a mind to, if it wasn't called for. Q. That was before you were sworn the other time, was it? A. When I was down to the house. Q. Did you keep it back on the former trial ? A. I don't know whether I swore to it at that time or not. I am swearing to it now. Q.

Don't you know that you kept it back the other time, and didn't tell it? Don't you know you did? A. Yes. Q. You did it on that advice? A. He said, if it wasn't called for, I shouldn't mentioned it. The Court: What was it,—about his throwing up and pushing the Indian back against the door? Q. Pushing him and striking him? A. Striking him. Q. You kept it back the other time? A. I belive I did. I don't know whether I did or not." Thereupon the court, addressing one of the counsel for the defendant, said: " Do you say, Mr. Briggs, that she kept it back entirely? I understand that the minutes show, and my recollections would be, that she did swear that George struck him." Shortly afterwards the court again interposed and said: " The court has taken the position that she did swear to it upon the other trial. I think she is mistaken about it. I think she is mistaken about her swearing to it. I am not going to spend any time to hunt up that testimony. It is my recollection of it, and it is about enough of it for just this time." Except as stated, it did not appear, either by the minutes or in any other way, that the witness so testified upon the first trial. Thus, upon two occasions the learned justice presiding inadvertently stated his own recollection as to a material fact, and was mistaken both times. On the first occasion the judge stated that the witness had sworn one way. when she had in fact sworn another. Whether George grabbed the defendant after knocking him against the door just before the stabbing took place was important upon the question of deliberation, as it tended to show a struggle and a fight. There is a marked difference between stating that George did not grab the defendant at all, and that the witness did not see whether he grabbed him or not; for the former, if the witness was to be believed, took the element of a fight out of the case, to a great extent. The witness had repeatedly testified that she did not notice whether George grabbed the defendant or not, and she did not at any time testify that George did not grab him at all, yet the justice, with all the weight of his high character and impartial position, declared that her testimony was that " he didn't grab him at all." Upon appealing to the jury for confirmation, one of them stated, in substance, that he heard the witness testify that George did not

grab the defendant at all. According to the record before us, both court and juror were mistaken, and it is not probable that any one of the other 11 jurors, under the circumstances, would think that the evidence of the witness was other than as the court and the twelfth juror had stated it. It was an unintentional but actual perversion of the witness' testimony, under circumstances calculated to help the people and hurt the defendant. The torn shirt indicated that George had seized the defendant, but the witness was, in effect, made to say that this did not take place. On the second occasion, when an erroneous statement from the bench went before the jury as evidence, the witness had virtually admitted that she was guilty of suppressing evidence on the former trial. This reflected on her candor, if she was correct, but not if the court was correct. His statement tended to relieve an important witness of a serious imputation affecting her credibility. It was not proper for the court to tell the jury what the witness had sworn to upon the previous trial, when there was no evidence that she had so sworn. Such a statement to the jury should be made only by a sworn witness. The trial judge had no right to state his recollection of what the witness had sworn to upon the former trial, for it was not legal evidence of the fact. The statement of the court not only took the place of the testimony of the witness, but it was directly the reverse of what the witness had in fact testified to. It went to the jury without the sanction of an oath, yet came through such a channel as to have more effect than the statement of almost any witness under oath. It was to a certain extent a certificate of good character to a leading witness, who had shown that she did not deserve it. A newspaper paragraph would have been equally competent and less dangerous. We have recently held that, even on the trial of a civil action, a statement by the trial judge, made to the jury, of his personal recollection of what occurred at a previous trial in respect to a material fact, was reversible error, and that it was not cured by instructing the jury to dismiss the statement from their minds. Brooks v. Railway Co., 156 N. Y. 244, 252, 50 N. E. 947. We repeat with greater emphasis in this action, because it involves life and death, the following language used by Judge

O'BRIEN in that case, which involved only a right of property, viz. : " It will not detract in any degree from the high character of the learned judge to say that he did not at the moment fully appreciate the importance of his remarks, or the probable influence which would be given to them by the jury. He was about to submit to them a disputed question of fact upon the evidence, and he virtually threw into the scale against the defendant all the weight of his impartial position and unbiased recollection upon that very question. There was no longer any chance for the defendant to succeed, at least upon that issue." We think that the statements inadvertently made in the hurry of this long trial by the learnd justice below are presumed to have been injurious to the defendant. Whether they in fact changed the result or not, we cannot say judicially that they did not affect it. He had the right to have none but legal evidence received against him, yet illegal evidence was received, of a character so material and important that we cannot say to what extent it may have influenced the verdict. Under all the circumstances, and especially in view of the somewhat close question of fact on the subject of deliberation, we think these errors, although not expected to, are too serious to be disregarded.

The ante mortem statement of the deceased, made four days before he died, was read in evidence on behalf of the people, in which he declared, in substance, that the defendant attacked him without provocation or excuse, and inflicted the wounds in question upon him. The defendant's counsel objected to this evidence as incompetent, improper, and hearsay; and they now urge that dying declarations, although competent at common law, are no longer competent, because the Code of Criminal Procedure, in prescribing the rights of a defendant in a criminal action, provides that he is entitled " to be confronted with the witnesses against him in the presence of the court," except in certain cases not now material. Code Cr. Proc. § 8, par. 3. We do not think the legislature intended to abolish the rule governing the admission of dying declarations, and such certainly has not been the understanding of the profession or the courts. We are not aware that this question has ever been

raised before in this state, and yet the Criminal Code has been in force for nearly 20 years, and the Revised Statutes, which contain a similar provision, for nearly 70 years. 1 Rev. St. p. 94, § 14. The right of the accused to be confronted with the witnesses against him has always been a part of the bill of rights, and yet dying declarations have been received in evidence for time out of mind. The legislature doubtless intended to confer upon a defendant in a criminal action the right to be confronted with any living witness against him. It is upon this ground that the objection to the introduction of such declarations in evidence against a defendant, based on his constitutional right to be confronted with the witnesses against him, has been uniformerly overruled in those jurisdictions where such constitutional provisions are in force. It is invariably held that the deceased is not a witness, within the meaning of such a provision or of the bill of rights, and that it is sufficient if the defendant is confronted with the witness who testifies to the declaration. Mattox v. United States, 156 U. S. 237 240, 15 Sup. Ct. 337; Brown v. Commonwealth, 73 Pa. St. 321, 326; Campbell v. State, 11 Ga. 353; People v. Glenn, 10 Cal. 32; State v. Dickinson, 41 Wis. 299, 302 ; Robbins v. State, 8 Ohio St. 131; 1 Bish. Cr. Proc. § 1208; Greenl. Ev. § 156; 1 McClain, Cr. Law, § 425.

The court, in its charge to the jury upon the subject of dying declarations, said to them that " it is the experience of mankind that the premonition of immediate death, from which there is no hope of recovery, is always sufficient to influence persons so situated to speak the truth." The court cautioned the jury not to give as much weight to such evidence as if the same statement had been testified to by the deceased when in health and subject to cross-examination. He also left it to them to decide whether the deceased was without hope of recovery when he made the declarations, and told them that such declarations were to be taken with great caution, as they might be misunderstood, or might have been made in response to suggestive questions. The instruction, however, above quoted, was left substantially unchanged. In People v. Kraft, 91 Hun, 474, 476, 36 N. Y. Supp. 1034, affirmed 148 N. Y. 631, 43 N. E. 80, it

was said by the supreme court that "it is not the experience of mankind that the apprehension of immediate death from which there is no hope of escape, is always sufficient to induce persons so situated to speak the truth. Criminals convicted on the most convincing evidence often assert their innocence while standing face to face with their executioners." We held in that case that it was reversible error to charge the jury that a dying declaration should be "given all the sanction of evidence which the law can give to evidence." Dying declarations are received from necessity, in order to prevent a failure of justice, upon the theory that the belief of impending death is equivalent to an oath. The rule, as we understand it, goes no further. The fear of punishment by the law for perjury furnishes no safeguard that the declarant will speak the truth, and hence such evidence has no sanction except a belief in responsibility after death. All men, however, do not entertain that belief. Moreover, as was pointed out by Judge Gray in People v. Kraft, supra, the power of cross-examination, which is wholly wanting, is quite as essential in the process of eliciting the truth as the obligation of an oath. We recently reversed a judgment of death in a case in which the dying declaration of the deceased seemed utterly unreliable. People v. Carbone, 156 N. Y. 413, 415, 51 N. E. 23. Courts of high standing have held that an instruction that dying declarations are to. receive as much credit at testimony given under oath in open court is erroneous. State v. Van Sant, 80 Mo. 67, 77; State v. Mathes, 90 Mo. 571, 573, 2 S. W. 800; Lambeth v. State, 23 Miss. 322, 359. It has happened that a dying declaration accusing the defendant made one day was contradicted by another dying declaration of the same person made on a subsequent day, stating that the defendant "did not do it." Moore v. State 12 Ala. 764. So dying declarations have been shown to be positively untrue. White v. State, 30 Tex. App. 652, 18 S. W. 462. The elementary writers upon the subject dwell upon the infirmities of this kind of evidence, and all authorities agree that the credibility of the declaration is wholly for the jury. Underh. Cr. Ev. § 110; 3 Rice, Ev. 336; Rosc. Cr. Ev. 35. The learned trial judge virtually told the jury that if the deceased had no hope of recovery when he

made the declaration, and was correctly reported, according to the experience of mankind he spoke the truth. It is truth that he directed them to consider the evidence which tended to corroborate or contradict the statement made, and left it to them to say whether in fact the statement was true or not, and whether the general proposition laid down was correct or not in the case in hand. In other words, he allowed the jury to find that in this particular instance the deceased did not speak the truth, notwithstanding the circumstances surrounding him had always been found sufficient to influence other persons so situated to speak the truth. This was equivalent to saying that, if they should find this dying declaration untrue, it would be the first instance on record, yet they might so find if they saw fit. We think that the main proposition laid down by the court upon the subject, even when considered with what preceded and followed it, was erroneous and tended to injure the defendant.

Evidence was given in behalf of the defendant tending to show that Orson Webb, during his attendance as a witness for the people, had stated that he was going to swear the defendant to hell; that a bystander said, "That is a pretty hard saying for the main witness in the case for the people;" and that Webb replied, "I am going to do it, any way." Webb, in a guarded manner, denied this. The court was asked to charge the jury that they had the right to take this declaration into account in passing upon the weight of Webb's evidence; but the court replied, "I have called their attention to every fact that they have a right to take into consideration, whatever he said on the subject connected with the trial." In fact, the court had not in any way called the attention of the jury to the subject of the threat made by Webb. He had, however, directed their attention to the evidence tending to impeach and sustain the character of Webb, and, among other things, had said to them: "Now, of course, it is true that, while it is not always safe, still it is true that there are men who will engage in the commission of petty crimes, and yet you may rely upon their testimony, when that testimony is disconnected with any crime of which they are guilty or with which they are charged; and you have the right to take into consideration all the evidence which was given by

the witness Stimson, who swears that this man's credit is such that he is fairly entitled to consideration. You have a right to take into consideration that when he was arrested for taking cucumbers from some place, where it is claimed that he had had the man arrested for selling liquor to a minor, when he went before the magistrate he confessed his guilt, and that he was convicted. Now, is such a man as that liable to tell the truth? Do you believe what he says? Gentlemen, you have a right take into consideration the evidence of the balance of the Webb family as to this transaction there at the house, and see whether they corroborate the testimony which he has given. If he is fully corroborated, you have the right to take that into consideration for the purpose of seeing whether he is worthy of belief. Gentlemen, you have the right, and it is your duty, to take into consideration the character and standing and intelligence and respectability of all the witnesses in the case, from the highest to the lowest." While the court thus submitted to the jury the credibility of Webb in a general way, he did not mention the threat, which was of great importance, because it indicated a strong bias against the defendant. In response to the request made, he did not decline to charge further upon the subject than he had already charged, but virtually stated that he had called the attention of the jury to every fact that they had a right to take into consideration as affecting Webb's credibility. This, we think, was error, because the jury clearly had a right to take the threat into account and should have been permitted to do so.

It is true that none of these errors was challenged by an exception, but, under the humane statute governing our powers in capital cases, an exception does not stand between life and death. We are authorized to order a new trial when we are satisfied that the verdict was against the weight of evidence or against law, or that justice requires a new trial, even if no exception was taken in the court below. Code Cr. Proc. § 528. People v. Barberi, 149 N. Y. 256, 278, 43 N. E. 635; People v. Leonard, 143 N. Y. 360, 367, 38 N. E. 372. While we are required to give judgment without regard to technical errors or defects which do not affect the substantial rights of the parties,

we cannot say in this case that the errors were technical, or that the defects did not affect a substantial right of the defendant. Code Cr. Proc. § 542. The great power intrusted to us of reversing without an exception should be cautiously exercised, but it was given to be used, and it should be used, whenever we are satisfied from the record that justice requires a new trial. In the interest of the people, as well as the defendant, it should be exercised when the question of fact as to guilt, or the degree of guilt, is close, and there is a reasonable probability that the error affected the result. A multitude of rulings, made without much chance for reflection, during a protracted and closely-contested trial, is apt to result, and perhaps of necessity must result, in some errors of law; but when the percentage is so small that another trial would not be apt to reduce it, a new trial should not be ordered, unless upon the facts. When, however, the errors, even if not excepted to, are so grave and numerous as to satisfy the court that the defendant has not had a fair trial, under all the circumstances, the verdict should be set aside. Without further discussion, we close our review in the words of Judge MARTIN, used in rendering judgment on the former appeal in this action: "After carefully examining and considering the evidence, the rulings, and the charge contained in the record before us, we have become satisfied that justice requires us to grant the defendant a new trial in this action. In reaching this conclusion, we have not been wholly controlled by any one of the questions discussed, but upon a consideration of them all we have been led irresistibly to the conclusion that in the furtherance of justice a new trial should be granted." The judgment should be reversed and a new trial ordered.

HAIGHT, J. (dissenting).—There is really no dispute about the main and controlling facts in this case. Whatever conflict exists pertains to minor details, which could not and ought not to change the result. Suppose George did catch hold of the defendant's shirt and tear it while receiving the stabs which caused his death, under the evidence, it could have occurred at no other time. I fail to see how this fact, if such it be, tends

to relieve the defendant, or to show an absence on his part of motive and deliberation. His declarations before the act and his written statements afterwards show quite conclusively what his motive and intentions were. If this case was involved in any doubt, I should heartily join with my associates in the exercise of a discretion to award a new trial. But, viewing the case as one in which the essential and controlling facts are without dispute, I think we should disregard the technical errors and defects pointed out and affirm the judgment.

VANN, J., reads for reversal of judgment and granting new trial; PARKER, C. J., and O'BRIEN, BARTLETT, and MARTIN, JJ., concur; HAIGHT, J., reads for affirmance of judgment, and GRAY, J., votes for affirmance.

Judgment reversed, and new trial granted.