OPINION OF THE COURT
Dominic R. Massaro, J.
David Clark was murdered on July 5, 1992. As he was exiting an afternoon soccer game in the Bronx, he was set upon by an unknown number of assailants in the midst of a crowd. He was stabbed three times, shot three times, and, while attempting to flee his assailants, struck by an automobile. Following trial by jury, Herman Johnson was convicted of his murder by way of acting in concert. This pursuant to section 125.25 (2) of the Penal Law, murder in the second degree. The distinguishing feature of this particular section of the law is that the perpetrator evinces "a depraved indifference to human life” by engaging in conduct "which creates a grave risk of death to another person, and thereby causes the death of another person.” The result of said conduct is often referred to as "reckless murder.” In contrast, among the charges for which the accused was likewise tried, but acquitted, was murder in the second degree pursuant to section 125.25 (1) of the Penal Law, more commonly known as "intentional murder.”
The instant motion seeks to set aside the reckless murder verdict pursuant to CPL 330.30. It is granted.
SET ASIDE MOTION
CPL 330.30 specifies grounds upon which a court may set aside or modify a guilty verdict before sentence. Subdivision (1) is applicable here. It provides that the requested relief may *258 be granted upon: "1. Any ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court.”
The decisive issue before the court is whether the evidence presented at Mr. Johnson’s trial is legally sufficient to support the verdict rendered, or whether this evidence was inadequate as a matter of law to prove his guilt beyond a reasonable doubt (see, People v Carter, 63 NY2d 530 [1984]). CPL 70.10 (1) provides in relevant part that: " 'Legally sufficient evidence’ means competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant’s commission thereof.” (People v Siggia, 163 AD2d 113, 115 [1st Dept 1990], Iv denied sub nom. People v Partridge, 77 NY2d 842 [1991].) In this respect, People v Carthrens (171 AD2d 387, 392 [1st Dept 1991]) instructs that "[t]he standard for determining legal sufficiency is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt” (see, Jackson v Virginia, 443 US 307 [1979]; see also, People v Bleakley, 69 NY2d 490 [1987]; People v Contes, 60 NY2d 620 [1983]).
CONSPIRACY
The crime of reckless murder (Penal Law § 125.25 [2]) differs from intentional murder (Penal Law § 125.25 [1]) in that it results, not from a specific conscious intent to cause death, but from an indifference to or disregard of the risks attendant to reckless conduct. Therefore, reckless murder does not require proof of a defendant’s intent as a necessary element for purposes of conviction. While it is logically possible to "aid and abet” reckless murder, it follows, however, that prerequisitorial intent must be found by a jury by way of an objective circumstance bearing on the nature of a defendant’s conduct where such a conviction is based upon an acting in concert theory. Without such a finding, a conceptual difficulty arises. In this narrow respect, the term "unintentional” crime is something of a misnomer.
The definition of an accomplice as contained in section 20.00 of the Penal Law does not include one who conspires to commit a crime. Accessorial liability attaches only where the conspirator is found to have intentionally aided another to engage in conduct which constitutes the charged offense, while *259 himself "acting with the mental culpability required for [its] commission.” Thus, even a conspirator, without evidence of further deliberate action, will not be criminally liable, as an accomplice, for the commission of a crime that is the object of the conspiracy (see, People v McGee, 49 NY2d 48, cert denied sub nom. Waters v New York, 446 US 942 [1980]).
The law lays before the court, and the jury charge faithfully reflects, the statutory elements for acting in concert: "When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such act” (Penal Law § 20.00) (emphasis added).
The instruction applicable here sufficiently apprised the jury of the requisite culpable mental state, or the mens rea, required for engaging in one or more of the enumerated activities relevant to the furthering of reckless murder.
Acting in concert needs to be voluntary and purposefully intentional. When so acting, the specific act to be carried out must enjoy a "shared intent.” Shared intent, in turn, must be established through the introduction of adequate proof linking a coconspirator with the principal actor(s) (see, People v McLean, 107 AD2d 167 [1st Dept 1985]). A "community of purpose” must be shown; this by evidence of a preconceived plan or relationship between a defendant and another or others, the actual active perpetrators of the crime. This is absolutely necessary to support a finding that the within defendant acted as a coconspirator with the actual shooter(s) and stabber(s) of the victim (see, People v McLean, supra; see also, People v Monaco, 14 NY2d 43, 45 [1964] [adequate proof of design needed for each person charged must be shown to exclude other fair inferences]). Satisfying the difficulty of verifying his state of mind in this respect, a jury must find that a defendant either "solicits, requests, commands, importunes, or intentionally aids” the principal actor(s) to engage in the commission of the underlying crime, that is, his conscious aim or objective of so acting is addressed to and results in its commission (see, People v Olcan, 143 AD2d 369 [2d Dept 1988]).
An examination of the record in the instant case reveals that the evidence at trial charging this solely apprehended defendant as a conspirator fails to establish the required degree of "mental culpability” to link him with the principal *260 actors. Indeed, it is barren of proof that a conspiracy existed. The evidentiary sufficiency necessary to establish an equally shared mens rea by Mr. Johnson that would credibly link him to the instrument of another’s death has not been presented. Nor can the jury conjecture it.
In essence, there is a lack of specific testimony that might otherwise allow the jury, in retrospect, to draw a logical deduction to support the count upon which Mr. Johnson has been found guilty: that he participated in the reckless killing of the within victim by knowing furtherance of a conspiracy toward this end (see, People v Seda, 198 AD2d 98 [2d Dept 1993]). No evidence whatsoever was introduced by the State respecting the acting in concert theory, that is, whether a defendant "solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct” (see, Penal Law § 20.00; see, People v Garcia, 132 AD2d 565 [2d Dept 1987]).
PROSECUTION THEORY
The People advanced two evidentiary thrusts in seeking this conviction: a dying declaration, which was admitted, and a debt owed. The People argue that the evidence, combined as a whole, at least establishes a connection between defendant and the actual assailants. This supposition, however, is based on equivocal facts.
In considering its decision, the court is faced with the question of whether, under the peculiar circumstances extant here, the acting in concert conviction may properly rest upon the uncorroborated dying declaration. Although the weight to be given to a dying declaration is for the jury to decide, there is wide judicial recognition that " ' "[d]ying declarations are dangerous, because [they are] made with no fear of prosecution for perjury and without the test of cross-examination, which is the best method known to bring out the full and exact truth” ’ ” (People v Nieves, 67 NY2d 125, 133 [1986], quoting People v Falletto, 202 NY 494, 499 [1911]; see also, Fisch, New York Evidence § 923 [2d ed 1977]; Richardson, Evidence § 316 [Prince 10th ed]). As stated in Nieves (at 133), our Court of Appeals "has always regarded dying declarations with a degree of skepticism” (see, People v Bartelini, 285 NY 433 [1941]; People v Ludkowitz, 266 NY 233 [1935]; People v Corey, 157 NY 332 [1898]). In the course of trial testimony, evidence to corroborate the victim’s dying declaration was not *261 offered. The degree of evidentiary value ascribed to such declarations being less than in-court testimony, it must often be determined by the context in which it was uttered, as well as by any supporting evidence available in the evaluation of the declarant and his declaration (see, People v Nieves, supra).
The victim’s statement regarding Mr. Johnson’s role is ambiguous at best.* [1] Due to this ambiguity, his dying declaration lacks the necessary indicia of reliability to stand alone in the absence of at least a degree of corroboration (see, People v Esteves, 152 AD2d 406 [2d Dept 1989]). In light thereof, the court finds the uncorroborated dying declaration insufficient to support conviction (cf, People v Bartelini, supra).
The remaining thrust introduced by the State as a motivating factor for the crime concerns a two-year-old money debt, ostensibly owed by the victim to defendant’s son. While testimony indicated the victim had earlier voiced fear for his well-being because of this money dispute, a third-party debt appears a tenuous thread with which to bind Mr. Johnson to the victim’s murder.
Both sides concede the fact that defendant was present at *262 the time of the infliction of death. The single and uncontroverted eyewitness testimony of the killing describes defendant, a half block removed, as one of many nonparticipating observers. It is black letter law that mere presence at the scene of a crime is insufficient for conviction (see, People v Slaughter, 56 NY2d 993 [1982]; see also, People v Olcan, supra).
In the final analysis, the court finds the totality of the evidence insufficient to support this conviction. It does not exclude a fair inference of defendant’s noninvolvement with the actual shooter(s) and stabber(s). Clearly, the evidence is not legally sufficient for a jury to infer a cogent line of reasoning that would establish, beyond a reasonable doubt, the acting in concert conduct by defendant required to sustain his conviction of murder in the second degree, that is, reckless murder.
RECKLESS MURDER
It is helpful to review again that a person commits reckless murder when, in the judgment of the jury, his conduct, beyond being merely reckless, is wanton and deficient in moral sense and concern for the value of human life. "Reckless” is a defined culpable mental state. In People v Gallagher (69 NY2d 525, 533 [1987] [dissent, Bellacosa, J., citing Penal Law § 15.05 (3)]), the Court of Appeals set forth the culpable mental state for establishing depraved indifference murder as a reckless act which, in turn, is defined as an individual acting "when he is aware of and consciously disregards a substantial and unjustifiable risk that [a] result occur or that such circumstance exists” (see, People v Register, 60 NY2d 270 [1983]).
Depraved indifference murder is defined as "[e]xtremely negligent conduct, which creates what a reasonable man would realize to be not only an unjustifiable but also a very high degree of risk of death or serious bodily injury to another or to others — though unaccompanied by any intent to kill or do serious bodily injury — and which actually causes the death of another, may constitute murder” (LaFave and Scott, Criminal Law, 617 [2d ed 1986]).
There is no evidence leading exclusively to the inference that Mr. Johnson aided or abetted another or others to engage in the within reckless conduct.
CONCLUSION
It is only with great caution that a court should incline *263 itself to grant a motion to set aside a verdict which has been arrived at by a jury after careful deliberation, particularly one involving a charge of homicide. Nevertheless, this court has scoured the proceedings in vain to find sufficient evidence to support a factual determination that might form the basis for the instant conviction. Rather, all of the evidence, to borrow from People v Palermo (NYLJ, July 19, 1990, at 27, cols 1, 2 [Suffolk County Ct 1990]), "is consistent with and points directly toward a traditional intentional murder, and that same evidence is entirely inconsistent with and insufficient to support any finding of depraved mind murder” under an acting in concert theory.[2]
In viewing the evidence at hand — the deceased’s dying declaration, the motive advanced for the crime, expert testimony as to multiple assailants, the use of multiple weapons and the type of wounds inflicted as being at near or point blank range — in a light most favorable to the People, defendant’s stated presence at the crime scene combines neither with the deceased’s dying declaration nor the two-year-old money dispute involving a person unrelated to this case, or both together, to allow — save for speculation — permissible inferences necessary for one to rationally reach the factual conclusion reached by this jury, clearly not to the "beyond a reasonable doubt” standard required for a criminal conviction.
In light of its granting of the plea to set aside his conviction, it is unnecessary for the court to treat the remaining aspects of Mr. Johnson’s posttrial motion.

. Sergeant Zonneveld for the People:
"Q. What, if anything, happened when you went over there and you bent down next to him?
"A. I bent over, it was approximately two feet from him. There was a lot of noise, people were saying things from the crowd and I asked him, 'Do you know who did this to you, who did this to you?’ He hesitated, his face grimaced, he held onto his stomach, he stopped, he nodded his head yes. At that point I waited for him to respond. He didn’t respond. I said, 'Could you give me a street name, anything?’ At which time he stated, 'Buffy.’ ”
Police Officer Ferreti for the People:
"Q. Okay and what happened then?
"A. And the sergeant said, 'Bufiy, could you spell that for me,’ and after a brief pause, again Mr. Clark said it, but this time spelling it out 'B-u-f-f-y.’
"Q. What happened then?
"A. Well then the sergeant like tried to put it down in his book so he almost blocked my view of like Mr. Clark lying on the ground. So I had to move around. And I asked him, 'Is there anything else, is there anything else you can give me,’ and he hesitated again and then he said, 'Lester,’ and I said — I didn’t say anything and he said, 'Lester and Barker’ and I put that down in my book, my memo book.”
By nodding to indicate "yes”, and answering defendant’s nickname, "Btffiy, B-u-f-f-y”, and the intersecting street where defendant’s home is located, "Lester and Barker”, was the deceased stating (a) that defendant was the person who shot and/or stabbed him; or (b) that defendant was involved in the incident, but was not the person who shot and/or stabbed him; or (c) that defendant, although not a participant, knew who was involved in the incident?

. In their summation, the People implicitly discount the elements necessary to establish reckless murder: "The killers had the intent to kill him. You don’t shoot ** * * and stab a man three times if you don’t want him dead. This is not something that is random where you wouldn’t know * * * [h]e was a target. No stray bullet shot him.”