**STATE of Maine**

v.

**Milton E. CHAPLIN, Jr.**

Supreme Judicial Court of Maine.

Jan. 24, 1972.

Richard S. Cohen, Peter T. Dawson, Asst. Attys. Gen., Augusta, for plaintiff.

Wathen & Wathen, by Daniel E. Wathen, Augusta, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEBBER, Justice.

On appeal. Defendant, indicted for the murder of his wife, was by jury verdict convicted of manslaughter. The defendant elected to testify in his own behalf and some of the facts are not in dispute. While engaged in a struggle in their home involving the possession of a hunting knife, either (a) the defendant stabbed his wife, or (b) he suddenly relinquished his grasp upon the knife and she accidentally stabbed herself. Immediately thereafter he assisted her out of the apartment and to the lawn where she lay until removed to the hospital by ambulance. During that period she made certain statements admitted in evidence as dying declarations. Several witnesses were then present including the defendant. Apart from statements bearing on the victim's expectation of impending death, she was variously quoted by the witnesses who were present as follows:

Witness Struck: "She (Mrs. Chaplin) also stated to get him (the defendant) away from me,[1] that he done this to her, that she wanted somebody to watch the children."

Witness Thomas: "He did this to me. * * * Please get him away from me, I can't breathe."

Witness Ward: "He told her he loved her, and he didn't mean it. * * * She asked him why he had done it. And he said, 'You made me.' "

That the significant portions of the above quoted statements were actually made as part of a conversation between Mrs. Chap-

---

1. The evidence is clear and the jury could not have concluded otherwise than that the request to "get him away from me" did not stem from any fear of recurrent violence or injury from the defendant. The defendant was then kneeling beside his wife, offering assurances of his love and repeatedly kissing her. In her wounded condition she was having difficulty in breathing which was enhanced by the actions of the defendant.

lin and the defendant became apparent when the defendant testified as follows:

(On direct examination) "I kept telling her I loved her, I loved her. And then she said, 'I don't want to die. Get away from me. You did this,' she says, 'Get away from me.' * * * I said, 'I didn't mean to. You made me.' * * * And Susie (Mrs. Chaplin) kept saying, 'Get him away from me, he did this to me, I can't breathe.' And Mrs. Ward told me, 'Give her some air.' "

(On cross examination) "I kept telling her I loved her, and I loved her. And then she said, 'I don't want to die. Get away from me. You did this.' * * * And I was kissing her at the same time. * * * And then she told Mrs. Ward— I think she said, 'Get him away from me. He did this to me.' * * * And I remember she said, 'Why did you do that?' And I said, 'I didn't mean to. You made me.' "

*Very shortly after this conversation oc-curred*, Mrs. Chaplin was removed to the hospital where she died within a few hours. Several witnesses were permitted to testify over objection to statements made by Mrs. Chaplin at the hospital not in the presence of the defendant. We quote only those portions of the testimony which raise issues of law for review, as follows:

Witness Struck: "She stated that he had done this to her, *and that he had tried to stab her twice before.* * * * As I said, at the scene she had stated that she was going to die, and this was what she was saying when I first got in there (the emergency room), too. * * * And this was repeated peri-odically throughout my stay in the emergency room." (Emphasis ours.)

Witness Dr. Peddle: "She said 'I am going to die,' many times. She said this many times." (As to her condi-tion), "The fact that blood pressure was not recordable, the pulse was not palpable. She was suffering from ex-treme blood loss, and she was consci-ous. * * * I said, 'What happened?' * * * She said, 'My husband stabbed me.' * * * She said, *'He has tried before, but I would not let him.'* " (Emphasis ours.)

Witness Nurse Baker: "She asked if she was going to die. * * * She asked several times." (Witness did not re-spond to that inquiry). * * * Then she said, in the accident room, she knew she was going to die. * * * She said, 'He stabbed me, *he's tried several times before.'* " (Emphasis ours.)

Witness Nurse Edgecomb: "She said she was going to die, and for someone to help her, she was going to die. * * * Several times. * * * She stated that he stabbed her. * * * She said her husband stabbed her. She should say her ex-husband, she was trying to get a divorce."

After a preliminary hearing in the ab-sence of the jury on the issue of the volun-tariness of certain admissions made by the defendant, Sergeant Struck was permitted over objection to testify in the presence of the jury that immediately after the death of Mrs. Chaplin he charged the defendant with murder and transported him from the hospital to the county jail; that in the course of this transportation in a police car the defendant, not as part of a police interrogation or in answer to a question, spontaneously informed the witness, "That the only reason why he moved here was because he had lost his license, and that he wanted to make a living for his wife and family; and that if he hadn't have been so jealous he wouldn't have stabbed her, if only he hadn't have been so jealous; and then he made the statement that he wanted her to himself; he didn't want to share her with anyone." Officer Marshall testified that in a conversation with his brother Roy Chaplin at the hospital which the witness overheard, the defendant said, "I shouldn't have stabbed her." Officer Greenleaf who

was driving the police car in which the defendant was transported to jail heard only snatches of conversation and recalled only that the defendant had said to Sergeant Struck, "I'm sorry that I stabbed her. If I hadn't been so jealous this wouldn't have happened."

In the course of the presentation of the State's evidence there was admitted over objection a photographic slide in color depicting cuts on the left arm of the victim as well as the puncture wound and surgical scar on her abdomen, this photograph having been taken during the autopsy.

While the State was in the process of proving the continuity of possession of the knife alleged to have been the weapon employed to inflict the fatal wound, a witness for the State testified as follows:

"Q. Now did something happen when Lorraine Allen came into your kitchen?

A. Yes. She came screaming through the door with a knife in her hand, and said, 'This is what he did it with.' "

Counsel for defendant immediately objected and asked that the answer be stricken. This was done and the jury was instructed to disregard the testimony. Counsel for defendant then moved for a mistrial which motion was denied.

Officer Marshall, called as a rebuttal witness by the State, was permitted over objection to relate what Roy Chaplin had said to the defendant as part of a conversation which the two brothers had at the hospital. Roy Chaplin was quoted as saying, "I knew some day your temper would catch up to you," and "You know this has happened twice before." As a witness for the defendant, Roy Chaplin had denied making these statements to the defendant.

At the close of the State's case and again before the case was submitted to the jury, the defendant moved for a judgment of acquittal. In each case the motion was denied.

This appeal must be sustained and a new trial ordered. Since the case must be tried anew we will discuss certain points raised by defendant even though they may not be decisive of this appeal.

## Dying Declarations.

A. Statements made by Mrs. Chaplin at the scene.

■ As already noted Mrs. Chaplin was half led and half carried from her home by the defendant and placed in a reclining position on the lawn. She was bleeding profusely and was suffering mental and physical anguish from the wound she had just received. During the very short period she remained there before the arrival of an ambulance, she made certain statements, the most significant of which were addressed to her husband who remained kneeling beside her. These statements were admitted as dying declarations by the Court. Later in this opinion we will have occasion to discuss the rules applicable to such declarations. Suffice it to say that these declarations were admissible not only as dying declarations, the declarant giving every evidence of her knowledge of impending death and the hopelessness of her case, but also on two other independent grounds. Mrs. Chaplin's utterances on this occasion, following so soon after her traumatic experience as to form a part of it and to negative any opportunity or purpose to fabricate evidence, were admissible as part of the res gestae. In Hersum, Admr. v. Kennebec Water Dist. (1955) 151 Me. 256, 270, 117 A.2d 334, we had occasion to discuss the res gestae rule in these terms:

"This was no mere narration of a past event. Rather was it a spontaneous explanation uttered in the course of a continuing action. In State v. Maddox, 92 Me. 348 at 353, 42 A. 788 at page 789, the general rule was stated as follows: 'It is said in Lander v. People, 104 Ill. 248, that, "the true test of the admissibility of such testimony is that the act,

declaration or exclamation must be so intimately interwoven with the principal fact or event which it characterizes as to be regarded a part of the transaction itself, and also to clearly negative any premeditation or purpose to manufacture testimony." ' 20 Am.Jur. 553, Sec. 662,[2] states in part, 'Stated differently, the term *"res gestae"* comprehends a situation which presents a startling or unusual occurrence sufficient to produce a spontaneous and instinctive reaction, during which interval certain statements are made under such circumstances as to show lack of forethought or deliberate design in the formulation of their content. Statements which conform to these requirements and which in some way elucidate, qualify, or characterize the act in question are admissible in evidence as a distinct and separate exception to the hearsay rule.' The precise form of the statement does not govern its admissibility. It may be in narrative form and in answer to a question if it meets all the requirements of admissibility as part of the *res gestae*."

Moreover, admissibility could be predicated on the fact that what Mrs. Chaplin said was spoken either directly to the defendant or as part of a conversation in which defendant was voluntarily participating, a fact fully confirmed later by defendant's own testimony. Where statements were made under these circumstances of such a nature that adverse inferences with respect to material issues could properly be drawn from defendant's responses and statements, the statements made by Mrs. Chaplin became admissible to explain and make meaningful the defendant's responses. People v. Davis (1954) 43 Cal.2d 661, 276 P.2d 801.

We find no error in the admission of Mrs. Chaplin's statements at the scene and before her removal to the hospital.

B. Statements made by Mrs. Chaplin at the hospital.

■ When the State in the presentation of its case reached the point at which it was ready to produce evidence of dying declarations of Mrs. Chaplin, the Court very properly excused the jury and heard testimony bearing on admissibility. We take this occasion to commend the practice of holding such a preliminary hearing in the absence of the jury as the most effective means of avoiding the possibility of a mistrial which might otherwise result. Only one Maine case furnishes any guidance with respect to the admission of dying declarations and the respective roles of the presiding Justice and the jury. State v. Bordeleau (1920) 118 Me. 424, 426, 428, 108 A. 464, furnishes some assistance but leaves unanswered as many questions as it answers. In *Bordeleau* our Court stated some of the basic principles in these terms:

> "Counsel accept the general principle that the solemnity of the situation of a person under the conviction that he is about to die, with all hope of recovery gone, supplies a circumstantial guaranty that his statements are in accordance with the truth, notwithstanding they are not sanctioned by oath, and that cross-examination is impossible. 'As this guaranty consists in the subjective effect of the approach of death,' to use the language of Mr. Wigmore, (2 Wigmore on Ev. § 1439) [3] it must appear to the presiding justice that at the time of making the statements the deceased must be conscious of the certainty of approaching speedy death; if any hope of recovery remains, the declarations are inadmissible; nor is it sufficient that the deceased has only the belief that he may ultimately die of his injuries. To quote from a case on respondent's brief: 'The person making the declaration shall have a complete conviction that death is at hand. * * * Death, shortly to ensue, must be an absolute certainty, so far as the consciousness of the person making the declaration is concerned.' * * *

---

2. See 29 Am.Jur.2d 769, Sec. 708 et seq. for revised text covering Res Gestae statements.

3. See Wigmore on Evidence, 3d Ed., Vol. V, Page 232, Sec. 1439 for revised text.

But the actual period of survival after making the declaration is immaterial. It is the consciousness of almost immediate dissolution, and not the rapid succession of death in point of fact, that renders the testimony admissible. These propositions are supported by the authorities: * * *.

"This consciousness of impending death, this phase of mind, may be established by any relevant evidence. The range of competent evidence is wide. It may include evidence of the physical condition of the declarant at the time of making the statement, from which the inference may be legitimately drawn that the declarant had a conscious sense of impending death, as well as evidence of the declarant's conduct and declarations."

After reviewing the evidence and holding the declarations properly admitted, the *Bordeleau* Court continued:

"The declarations as given by the witnesses fully meet the requirements of completeness; they are free from all indication of malice or desire for revenge. * * *

After the evidence is admitted, its credibility is entirely within the province of the jury, who should have the opportunity to weigh all the circumstances under which the declarations were made, including those already proved to the presiding justice, and may give the testimony and the declarations such credit as they think they may deserve."

In *Bordeleau* the presiding Justice had indicated his uncertainty as to whether he should treat his own determination of the underlying facts (as to the state of mind of the declarant) as conclusive or should submit them to the jury. He elected to follow the Massachusetts rule [4] and permit a second determination of the preliminary facts by the jury. The *Bordeleau* Court merely recognized the conflict in authority on this point [5] but declined to take a position since application of the Massachusetts rule could only benefit the respondent and could not constitute prejudicial error of which he could properly complain.

Although *Bordeleau* teaches in unmistakable terms what the preliminary underlying facts are which must be determined by *somebody,* the case furnishes no guidance as to these important questions. Is the trial court to make the final determination of these facts? If so, by what quantum of proof? By "convincing proof," whatever that may be? By "proof beyond a reasonable doubt"? Or by some less demanding test? Is the jury to be sole arbiter of these facts? Or is it to make a second and subsequent determination and in effect hold a veto power over the factual findings of the presiding Justice? In either event, by what quantum of proof?

In the instant case the Justice below, faced with the uncertainties unresolved by *Bordeleau,* adopted those procedures which would be most favorable to the defendant. As preliminary to his own ruling on admissibility, he required the State to present evidence which satisfied him beyond a reasonable doubt that the deceased was convinced of impending speedy death and entertained no hope of recovery. In his instructions to the jury he carefully refrained from informing them that he had made any factual determination and, in effect, directed them to disregard the dying declarations unless they first concluded that the preliminary factual requirements had been

---

4. Cases cited in *Bordeleau* for the Massachusetts position were Commonwealth v. Brewer, 164 Mass. 577, 582, 42 N.E. 92 and Commonwealth v. Bishop, 165 Mass. 148, 152, 42 N.E. 560.

5. *Bordeleau* noted that the contrary view (that admissibility including determination of the preliminary facts is exclusively a matter for the Court) is "forcibly stated" in Wigmore on Evidence. *Bordeleau* also noted two New Jersey cases as supportive of the contrary view, Donnelly v. State, 26 N.J.L. 463 and State v. Monich, (1906) 74 N.J.L. 522, 64 A. 1016. Wigmore on Evidence, 3d Ed., Vol. V, Page 257, Sec. 1451 currently characterizes the Massachusetts rule as "heresy."

proven beyond a reasonable doubt. He properly included as a requisite factor to be so proven the accuracy of the witness or witnesses in their reporting of the dying declarations attributed to the deceased. The Justice below was also careful to treat each occasion on which dying declarations were made separately, recognizing that the state of mind of the declarant might well vary from situation to situation. Batten v. Commonwealth (1949) 190 Va. 235, 56 S.E.2d 231. The hope of recovery, completely absent on one occasion, may for example be later renewed by an improvement in the patient's condition or the assurances offered by doctors and nurses.

We turn now to an examination of the rationale underlying the conflicting views found in the cases dealing with the several questions posed above in this opinion. In Commonwealth v. Polian (1934) 288 Mass. 494, 193 N.E. 68, 96 A.L.R. 615, the Court, while accepting the practice of permitting the defendant to have a "second opportunity" to have the statements excluded from consideration by the jury if they do not find the essential preliminary facts, concluded that the jury need only find these facts supported by the fair preponderance of the evidence. The Court felt that the more rigorous requirement of proof beyond a reasonable doubt should be reserved for the essential elements of the crime. Whether the fair preponderance test would govern the initial determination by the trial court is not made clear by the opinion although it is clear that he must first pass upon the same facts. Polian is followed by an annotation in 96 A.L.R. 621 which suggests that the majority view requires proof of the preliminary facts which satisfies the jury beyond a reasonable doubt. We read People v. Bartelini (1941) 285 N.Y. 433, 35 N.E.2d 29, 167 A.L.R. 139, as holding that there must be "clear proof" of preliminary facts before the trial court before he may properly admit the dying declarations. Bartelini is the lead case used in connection with a helpful annotation found in 167 A.L.R. 147. A few cases selected at random will serve to illustrate the confused state of the law on this subject. People v. Tilley (1950) 406 Ill. 398, 94 N.E.2d 328, required proof beyond a reasonable doubt before the trial court, the same test being applied when the same questions are subsequently submitted to the jury. People v. Johnson (1952) 334 Mich. 169, 54 N.W.2d 206, defined the quantum of proof requisite in the preliminary proceeding before the trial court by holding that "those preliminary matters necessary to be determined before the admission of a dying declaration should be clearly established." There is language in the opinion that suggests that the Johnson Court equated "clearly established" with proof beyond a reasonable doubt.

Since it is impossible to reconcile such widely divergent views, our approach is to identify the objective to be obtained and such policy considerations as may seem to dictate the most effective means of accomplishing the desired result. We think it highly desirable insofar as possible to preserve the role of the judge as arbiter of the applicable law and of the jury as exclusive finder of the facts. Rulings on admissibility of evidence are designed to prevent the jury from hearing, being prejudiced by or giving consideration to matters which under established legal principles have no place in the case. We find persuasive the majority view that since the jury is to determine the weight and credibility of dying declarations they should also pass upon the preliminary facts. The truthfulness and accuracy of the reporting witnesses are of primary importance. Dying declarations are sometimes the strongest and even the only evidence available as to what actually transpired as between the defendant and his victim. When they are admitted, the defendant loses the benefit of having the deceased witness subject to sanctions of an oath and the scrutiny of his cross-examination. Thus the importance of the proof of the preliminary facts which alone can make these declarations, otherwise hearsay, admissible must not be minimized. It imposes no undue burden

upon the State, therefore, to require that these essential facts be proved to the jury beyond a reasonable doubt. As to the role of the presiding Justice, however, we are satisfied that his should be a legal function and that he should not be assigned the task of a factfinder—nor should he be bound by some artificially contrived burden of proof. We are not here subject to any constitutional requirement of independent judicial determination of facts as is the case when the voluntariness of a confession is the issue. Jackson v. Denno (1964) 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. The reasons which prompt the Denno rule have no application to dying declarations. We are satisfied and now hold that the presiding Justice in a preliminary hearing, absent the jury, should examine the evidence to be tendered in support of the facts essential to admission of dying declarations. If he is satisfied that there is credible evidence which if believed would permit but not compel the jury to find the preliminary facts proven beyond a reasonable doubt, he should, unless they violate other legal principles, admit the dying declarations into evidence. The jury may then determine the weight and credibility to be given to the declarations, assigning to them no weight whatsoever if in their judgment the preliminary facts are not so proven. In our view the practice outlined above better accords with the proper functions of judge and jury and will tend to eliminate some of the confusion readily apparent in the case law on this subject.

■ In the instant case the defendant contends that the undisputed evidence of Mrs. Chaplin's pleas for help indicate as a matter of law that she had not abandoned hope of recovery so as to make her declarations inadmissible. Although proper for jury consideration, we do not think these instinctive pleas, accompanied as they were by unqualified assertions of her conviction that she was dying, have that legal effect. Our view is the same with respect to her statement that she was "trying to get a

divorce," a statement which the jury could properly regard as a reference to past action rather than an expression of hope for the future.

■ The defendant asserts that the declarations were inadmissible as a matter of law because they violated the requirement of completeness. We think the defendant misconceives the rule since he seems to argue that the State failed to present all of its available witnesses in the preliminary hearing before the presiding Justice. The "Rule of Completeness" has a very different connotation. Wigmore on Evidence, 3d Ed., Vol. V, Page 251, Sec. 1448 carefully explains the rule in these terms:

> "The statement as offered must not be merely a part of the whole as it was expressed by the declarant; it must be complete as far as it goes. But it is immaterial *how much of the whole affair of the death* is related, provided the statement includes all that the declarant wished or intended to include in it. Thus, if an interruption (by death or by an intruder) cuts short a statement which thus remains clearly less than that which the dying person wished to make, the fragmentary statement is not receivable, because the intended whole is not there, and the whole might be of a very different effect from that of the fragment; yet if the dying person finishes the statement he wishes to make, it is no objection that he has told only a portion of what he might have been able to tell."

See also Anno. 94 A.L.R. 679.

There is no suggestion that the rule as thus defined was violated in this case.

■ Among the duties of the trial court in ruling on admissibility is the obligation to determine whether or not a portion of the declarant's statement must be excluded even though the balance of the statement meets all of the applicable requirements. So in the instant case Mrs.

Chaplin was quoted by several witnesses as saying at the hospital, in effect, that her husband stabbed her and that "he had tried to stab her twice before," that "he has tried before but I would not let him," that "he's tried several times before." Specific and independent grounds of objection were seasonably noted to the admission of the above quoted portions of the declarations. Clearly, these accusations of past efforts and inclination to stab the declarant were, if inadmissible, highly prejudicial to the defendant, especially in view of the fact that the primary defense was a claim of accident. Courts have accepted the evidentiary value of dying declarations but only for limited purposes and only because of the necessity which arises from the death of one who would otherwise be available as a primary prosecuting witness. Recognizing the hearsay quality of the evidence and the important loss of the truth testing mechanism of cross-examination, courts have been unwilling to permit the use of such evidence beyond the limits of that necessity. Accordingly it has been universally held that "a dying declaration must be confined to the circumstances immediately attending the homicide and forming part of the res gestae. A declaration as to a previous transaction is inadmissible." Anno. 14 A.L.R. 757; Jones on Evidence, 5th Ed., Vol. 2, Page 575, Sec. 305; Underhill's Criminal Evidence, 5th Ed., Vol. 2, Page 738, Sec. 293; and cases cited in above texts. The rationale of the limiting rule is carefully stated in Jones v. State (1951) 94 Okl.Cr. 359, 236 P.2d 102, 110. The State suggests that there is a so-called Kentucky rule, broader in scope, which, although a minority rule, should be viewed as better reasoned. We have examined the Kentucky authorities and are satisfied that the courts of that State subscribe to the rule limiting declarations to the res gestae precisely as do other courts. Nolan v. Commonwealth (1935) 261 Ky. 384, 87 S.W. 2d 946, 948; Meade v. Commonwealth (1928) 225 Ky. 177, 7 S.W.2d 1052, 1055. The reason for the rule is well illustrated when applied to the facts of this case. If cross-examination had been available, it might have revealed that the alleged prior acts of the defendant had occurred many years before or that what the declarant characterized as attempts to stab her were in reality innocuous or even imaginary acts bearing no relationship whatever to this alleged homicide. The State has all the benefit from dying declarations to which it is entitled when it is permitted to use them to prove identity of the assailant and the events which comprise the res gestae. We conclude that it was error to permit the witnesses to relate that portion of the declarations alleging prior attempts to stab the declarant. As we have already noted, the error was highly prejudicial and requires that defendant be afforded a new trial. The inadmissible portions of the declarations may upon a new trial be properly severed from the admissible portions by the use of cautionary instructions to the witnesses which may be given in the absence of the jury.

In view of this holding it becomes unnecessary to dwell at length upon other points raised on this appeal. We make these brief comments as an aid to the Court below upon a new trial.

### Voluntariness of Admissions

■ The Justice below conducted the required preliminary hearing and found the admissions to have been made voluntarily. Not only was the defendant repeatedly advised and warned as to his constitutional rights but the admissions when made were not made in a coercive atmosphere. In one case defendant was engaged in conversation with his brother and in the other defendant made spontaneous statements to a police officer, not as part of a police interrogation nor even in answer to a question. Under these circumstances the admissions would have been properly admitted even though the so-called Miranda warnings had never been given.

### Admission of Slide-Rebuttal Evidence

■ There was no error in admitting State's Exhibit 3. This was a matter clearly within the discretion of the presiding Justice. Neither was there any abuse of discretion in permitting expert opinion testimony with respect to the consistent possibility of a relationship of the knife in evidence to the cuts on Mrs. Chaplin's arm. We reach the same conclusion with respect to the admission of testimony to rebut the evidence given by witness Roy Chaplin. We note in passing that the State should not have been prevented from putting in evidence the entire conversation between Roy Chaplin and the defendant as part of its main case.

### Motion for Acquittal

■ Apart from the error which prompts us to order a new trial, there was ample evidence to support a conviction for manslaughter. Essentially the case presented a simple issue of fact. The jury declined to accept the defendant's version of the events and his claim of accident which, if believed, would have entitled him to an acquittal. There was no occasion for the Justice below to grant a motion for acquittal.

■ Defendant was charged with and tried for murder. His conviction for manslaughter, the lesser degree of felonious homicide, acts as an acquittal of the charge of murder. He will be tried anew upon the charge as thus reduced. Green v. United States (1957) 355 U.S. 184, 190, 78 S.Ct. 221, 225, 2 L.Ed.2d 199.

The entry will be

Appeal sustained.

New trial order as for manslaughter.