J-A09038-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| THE SCRANTON CLUB | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| TUSCARORA WAYNE MUTUAL | : | |
| GROUP, INC., SUSQUEHANNA | : | |
| CAPITAL CORP., TUSCARORA WAYNE | : | |
| INSURANCE COMPANY, TUSCARORA | : | |
| WAYNE MUTUAL INSURANCE | : | |
| COMPANY | : | No. 238 MDA 2021 |

Appeal from the Order Entered January 25, 2021,
in the Court of Common Pleas of Lackawanna County,
Civil Division at No(s):  20 CV 2469.

BEFORE:  PANELLA, P.J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN:　　　　　**FILED: SEPTEMBER 12, 2023**

The Scranton Club appeals from the order sustaining the preliminary objections filed by Tuscarora Wayne Mutual Group, Inc., *et al.* and dismissing this action. The Scranton Club was seeking a declaration that its insurance policy provided coverage for losses sustained, including business income, during the pandemic.   Upon review, we reverse in part and affirm in part.

The trial court set forth the following relevant facts:

The Scranton Club operates a private social club, limited to selling alcoholic beverages and food to its members and to the members' guests, at its premises located at 404 North Washington Avenue, Scranton, and "also has a catering license and hosts various events on a regular basis, including but not limited to private parties, showers, and receptions," at those premises.   [I]t purchased a commercial insurance policy from defendant,

Tuscarora Wayne Insurance Company ("Tuscarora"), which afforded all risk coverage for the time period of January 19, 2020, through January 19, 2021. The Scranton Club maintains that the commercial policy provided property, business, personal property, business income, extra expense, as well as additional coverages, as reflected by the 118 page policy that is attached as an exhibit to the complaint.

The declaration pages set forth the various coverages, forms, endorsements, and monetary limits of insurance for [T]he Scranton Club's Commercial Package Policy.

Trial Court Opinion, 1/25/21, at 3-4 (quotations omitted).

Specifically, relevant provisions of the insurance policy regarding coverage and exclusions provided as follow:

**Building and Personal Property Coverage**

**A. Coverage**

Will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**\*\*\***

**Business Income (and Extra Expense) Coverage**

**A. Coverage**

**1. Business Income**

**\*\*\***

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to the property at premises . . . The loss or damage must be caused by or result from a Covered Cause of Loss.

**2. Extra Expense**

\*\*\*

b.     Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

(1)     Avoid or minimize the "suspension" of business and to continue operation at the described premises or at replacement premises or temporary location including relocation expenses and costs to equip and operate the replacement location.

(2)     Minimize the "suspension" of business if you cannot continue "operation."

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

\*\*\*

**5. Additional Coverages**

**a. Civil Authority**

\*\*\*

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1)     Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but

are not more than one mile from the damaged property; and

(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

As additional coverage, the policy also covers "Extended Business Income" after operations resume and while working on generating business income to the level before the loss.

For purposes of Business Income (and Extra Expense) Coverage, the policy set forth the following relevant definitions:

3. "Period of restoration" means the period of time that:

a. Begins:

(1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

(2) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

b. Ends on the earlier of:

(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(2) The date when business is resumed at a new permanent location.

\*\*\*

6. "Suspension" means:

> a. The slowdown or cessation of your business activities; or
>
> b. That a part or all of described premises is rendered untenantable if coverage for Business Income Including "Rental Value" or "Rental Value" applies."

Both the "Building and Personal Property Coverage" and the "Business Income (and Extra Expense) Coverage" apply where there is a "Covered Cause of Loss," which the policy states as follows:

**Causes of Loss – Special Form**

**A. Covered Causes of Loss**

When Special is shown in the declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:

1. Excluded in Section B., Exclusions; or

2. Limited in Section C., Limitations;

One such Exclusion provided:

**Exclusion of Loss Due to Virus or Bacteria**

A. The exclusion set forth in Paragraph B, applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

B. We will not pay for loss or damage caused by or resulting from any virus, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease.

R.R. at 32a, 75a, 82a-105a.

In the spring of 2020, Governor Wolf issued a stay-at-home order due to the COVID-19 pandemic. As a result, The Scranton Club was required to cease its normal operations and close its business. It sustained a "substantial

loss [in] revenues" and was forced to "furlough or layoff [] the majority of its employees."

The Scranton Club filed an insurance claim with Tuscarora based upon the foregoing insurance policy provisions. Tuscarora denied these claims because The Scranton Club did not suffer any "direct physical loss of or damage to" the insured premises as required under the Building and Personal Property Coverage and Business Income (and Extra Expense) Coverage. Additionally, Tuscarora cited the policy's Virus Exclusion as a basis for denial of coverage.

The Scranton Club filed this lawsuit seeking a declaration that its losses in connection with the closure orders and interruption of its business stemming from the pandemic were insured losses under the policy. Additionally, The Scranton Club filed a breach of contract claim alleging that Tuscarora's denial of coverage constituted a breach of its obligations under the insurance policy. Lastly, The Scranton Club claimed that Tuscarora acted in bad faith when it denied coverage under the policy.

Tuscarora filed preliminary objections in the nature of a demurrer to all three claims. It argued: coverage was barred by the policy's Virus Exclusion; The Scranton Club failed to allege any actual physical damage to establish "direct physical loss of or damage to" its property; the Civil Authority coverage did not apply because the governmental orders must be issued as a result of damage to other property and in response to "dangerous physical conditions" resulting from such damage; and, because the policy did not afford coverage,

there was no basis for The Scranton Club's bad faith claim. Although the trial court overruled the objection based on the Virus Exclusion, it sustained Tuscarora's objections as to Tuscarora's coverage arguments. Consequently, the court dismissed The Scranton Club's complaint in its entirety.

The Scranton Club filed this timely appeal. The Scranton Club and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

On appeal, Scranton raises the following issues:

1. Whether the trial court erred as a matter of law in sustaining the [Tuscarora's] preliminary objections in the nature of a demurrer as to [The Scranton Club's] claims based on a conclusion that []the Scranton Club failed to allege any "direct physical loss of or damage to" its property so as to state a cognizable claim for insurance coverage?

2. Whether the trial court erred as a matter of law in sustaining [Tuscarora's] preliminary objections in the nature of a demurrer as to [The Scranton Club's] claims seeking to recover under the Civil Authority coverage provided by the policy?

3. Whether the trial court erred as a matter of law in sustaining [Tuscarora's] preliminary objections in the nature of a demurrer as to The Scranton Club's claim for first–party bad faith liability pursuant to 42 Pa. Cons. Stat. Ann. §8371?

Scranton's Brief at 5.

Our role with respect to an appeal from preliminary objections is as follows:

A preliminary objection in the nature of a demurrer is properly sustained where the contested pleading is legally insufficient. Preliminary objections in the nature of a demurrer require the court to resolve the issues solely on the basis of the pleadings; no testimony or other evidence outside of the complaint may be considered to dispose of the legal issues presented by the demurrer. All material facts set forth in the pleading and all

inferences reasonably deducible therefrom must be admitted as true.

In determining whether the trial court properly sustained preliminary objections, the appellate court must examine the averments in the complaint, together with the documents and exhibits attached thereto, in order to evaluate the sufficiency of the facts averred. The impetus of our inquiry is to determine the legal sufficiency of the complaint and whether the pleading would permit recovery if ultimately proven. This Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or abuse of discretion. When sustaining the preliminary objections will result in the denial of claim or a dismissal of suit, the preliminary objections may be sustained only where the case is free and clear of doubt.

*Hill v. Ofalt,* 85 A.3d 540, 547-548 (Pa. Super. 2014) (quotation marks, citations, and corrections omitted).

Additionally, in an action arising under an insurance policy, we observe that "it is a necessary prerequisite . . . for the insured to show a claim within the coverage provided by the policy." *Betz v. Erie Ins. Exch.,* 957 A.2d 1244, 1256 (Pa. Super. 2008) (citing *Miller v. Boston Ins. Co.,* 218 A.2d 275, 278 (Pa. 1966)). As such, we are limited to considering the provisions of the policy itself.

Because coverage language varies from policy to policy, we must consider the language of the policy issued in each case. *See Bishops, Inc. v. Penn Nat. Ins.*, 984 A.2d 982, 993 (Pa. Super. 2009) (noting that "every holding arising from application of an insurance policy to a given set of facts is specific to that policy and those facts," and "a case may be of great value or little to the extent that the circumstances at issue are analogous to those in the current case"), *appeal denied*, 20 A.3d 482 (2011). Furthermore,

"'[w]here an insurer relies on a policy exclusion as the basis for its denial of coverage . . . , the insurer has asserted an affirmative defense, and accordingly, bears the burden of proving such defense.'" *Spece v. Erie Ins. Grp.,* 850 A.2d 679, 682 (Pa. Super. 2004) (quoting *Madison Construction Co. v. Harleysville Mutual Ins. Co.,* 735 A.2d 100, 106 (Pa. 1999)).

In its first issue, The Scranton Club claims that the trial court erred in sustaining Tuscarora's preliminary objections on the basis that it did not allege any "direct physical loss of or damage" to its property, so as to state a claim for coverage. Specifically, The Scranton Club claims it sustained a "direct physical loss of . . . property" when it was prohibited from hosting and serving customers on its premises during the pandemic and government ordered shutdown. Scranton's Brief at 23. According to The Scranton Club, "direct physical loss of . . . property" does not require that it show some physical damage to or alteration of the property, as Tuscarora argues and the trial court concluded, to trigger coverage for loss of business income. *Id.* at 25. Instead, The Scranton Club maintains that the policy covered its loss of use of the property. *Id.* at 28. The Scranton Club further argues that, given the conflicting interpretations of the parties, at a minimum, the policy language at issue is ambiguous. *Id.* at 38. Therefore, dismissal of its complaint was improper.

The trial court ruled that The Scranton Club did not allege any facts to establish that it incurred a "direct physical loss of or damage to property" as required to establish coverage under the policy. After surveying various cases

involving a policy requiring "physical loss of or damage to" property, the court noted that to trigger coverage, there must be "some form of physical damage to [The Scranton Club's] premises that rendered it uninhabitable or unusable." Trial Court Opinion, 1/25/21, at 34. The court further opined that the policy's definition of "period of restoration" contemplated that there would be some physical damage that required repair, rebuilding, or replacement, thereby lending support to the requirement that there be some physical damage or alteration to the property. The court noted that The Scranton Club did not allege any damage or alteration to its property or that any repair, restoration, or replacement of the premises occurred during the period of restoration. Consequently, the trial court held that The Scranton Club failed to allege facts to establish a claim within coverage of the policy.[1] *Id.* at 36. We disagree.

At the time of the trial court's decision in this matter, there was no Pennsylvania appellate precedent addressing the applicability of insurance policies to the economic losses incurred by businesses as a result of the pandemic. Even common pleas court cases had not addressed the merits of the substantive issues raised herein. The trial court noted this and consequently considered decisions from the federal courts. *Id.* at 20, 22, 30.

---

[1] The trial court also maintained that The Scranton Club did not argue that "direct physical loss of or damage to" property included "loss of use of its property," and as such has been waived for appeal purposes. Trial Court Opinion, 5/3/21, at 6; Scranton's Brief at 29. However, our review of the record reveals that The Scranton Club did raise this argument with the trial court. **See** R.R. 325a-30a.

However, since then, this Court, sitting *en banc*, decided ***Ungarean v. CNA***, 286 A.3d 353 (Pa. Super. 2022), *appeal granted*, 2023 WL 4530116 (2023).[2] There, Ungarean sought coverage for economic losses that his dental practice sustained as a result of closing it during the COVID-19 pandemic as mandated by the Governor under his CNA policy. CNA denied coverage claiming that Ungarean did not suffer any "direct physical loss of or damage to" property. Ungarean filed a declaratory judgment action seeking a declaration that his pandemic-related business losses were covered under the CNA Policy's Business Income, Extra Expense and Civil Authority provisions. Upon Ungarean's motion for summary judgment, the trial court granted it, declaring that he had suffered a direct physical loss of his dental practice and was entitled to coverage under the policy.

Upon CNA's appeal, we affirmed. In particular, we agreed with the trial court that Ungarean's loss of business income during the pandemic fell within the scope of his insurance policy's business income coverage due to suspension of operations caused by "direct physical loss of or damage to" property even though the property did not incur any actual physical damage. Critical to that decision, was the meaning of the phrase "direct physical loss

---

[2] We also decided ***MacMiles, LLC d/b/a Grant Street Tavern v. Erie Ins. Exch.***, 286 A.2d 331 (Pa. Super. 2022), *appeal granted*, 2023 WL 4528617 (2023), where we found no coverage. However, the policy in that case differed from the policy in ***Ungarean*** and the present case.

of or damage to property" as the policy did not define any of the terms therein, particularly "damage" and "loss." To resolve this, the trial court stated:

This [c]ourt [begins] its analysis [of what the phrase 'direct physical loss of . . . property' reasonably means] with the terms "damage" and "loss," as these terms are the crux of the disputed language . . . . "[D]amage" is defined as "loss or harm resulting from injury to person, property, or reputation," and "loss" is defined as "DESTRUCTION, RUIN ... [and/or] the act of losing possession [and/or] DEPRIVATION ..."

Based upon the above-provided definitions, it is clear that "damage" and "loss," in certain contexts, tend to overlap. This is evident because the definition of "damage" includes the term "loss," and at least one definition of "loss" includes the terms "destruction" and "ruin," both of which indicate some form of damage. However, [ ] in the context of this [CNA Policy], the concepts of "loss" and "damage" are separated by the disjunctive "or," and, therefore, the terms must mean something different from each other. Accordingly, in this instance, the most reasonable definition of 'loss' is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, *i.e.,* destruction and ruin. Applying this definition gives the term "loss" meaning that is different from the term "damage." Specifically, whereas the meaning of the term "damage" encompasses all forms of harm to [Ungarean's] property (complete or partial), this [c]ourt conclude[s] that the meaning of the term "loss" reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to [the] property.

*Id.* at 360 (quoting the Court of Common Pleas of Allegheny County).

Considering the trial court's analysis of the ordinary meaning of the operative words, "loss" and "damage," and the fact that CNA wrote the phrase in the disjunctive, this Court concluded that "direct physical loss" had a different meaning than "direct physical damage." *Id.* We further observed

that the definition of "loss" includes the loss of possession or deprivation of the property, whereas damage does not, and, as such, the phrase "loss of property" included the act of being deprived of the physical use of one's property." *Id.*

We further agreed with the trial court's rejection of CNA's argument that the "period of restoration" provisions in the policy supported its claim that there must be physical damage or alteration to the property to trigger coverage. Instead, as the trial court concluded, "period of restoration" related to the time limits for coverage and not the meaning of "physical loss of or damage to." *Id.* at 361. Therefore, we held that Ungarean's loss of the use of his property for his dental practice equated to a direct physical loss of his property, despite the fact that there was no physical damage or alteration to the property, to trigger coverage. The policy therefore provided coverage. *Id.* at 360.

Importantly, the pertinent provisions of the policy involved in this case are virtually identical to the policy provisions in *Ungarean*. First, the policy provides coverage "for direct physical loss of or damage to" covered property at the premises. It also provides coverage for loss of business income and extra expense incurred due to the suspension of an insured's operations caused by a "direct physical loss of or damage to" the covered property. The policy issued by Tuscarora also does not provide a definition for the phrase "direct physical loss or damage to property" or any of the terms used therein.

Applying the analysis and interpretation of this phrase adopted in ***Ungarean***, we conclude the trial court erred in determining that The Scranton Club was required to allege some physical damage or alteration to its property to trigger coverage. Instead, The Scranton Club's allegation that it lost the use of its property during the pandemic was sufficient, as a matter of law.

Additionally, as in ***Ungarean***, Tuscarora's argument that the definition of "period of restoration" changes the interpretation and indicates that physical damage is required, is unpersuasive. The definition of "period of restoration" does not apply to the policy's "Building and Personal Property Coverage." It does, however, apply to the policy's Business Income (and Extra Expense) Coverage, but we agree that The Scranton Club need not plead or show a change to the property's physical characteristics. Therefore, the trial court erred in sustaining Tuscarora's preliminary objections on this basis.

Tuscarora argues, however, that coverage is barred by the policy's Virus Exclusion, and as such is not obligated to cover any of The Scranton Club's claimed losses or expenses. Consequently, it maintains that the trial court erred in concluding that it could not determine, as a matter of law, that the Virus Exclusion applied and asks this Court on appeal to reverse the trial court's decision in that regard. Tuscarora's Brief at 36.

The trial court overruled Tuscarora's demurrer based on the Virus Exclusion. The court observed that this exclusion did not contain anti-concurrent causation language and consequently, the efficient proximate cause or concurrent causation doctrine applied. As such, the application of

the Virus Exclusion here could not be determined as a matter of law. Trial Court Opinion, 1/25/21, at 25. We agree.

Under the efficient proximate cause analysis that applies under Pennsylvania law, a covered risk and an excluded risk may combine to cause a loss, with the resulting loss or damage being covered by the policy. *See Trexler Lumber Co. v. Allemannia Fire Ins. Co.*, 136 A. 856, 858 (Pa. 1927). The trial court explained its application of this doctrine as follows:

> The Scranton Club avers that the coronavirus was never present at its insured premises and that the cause of its business losses was the government closure orders, whereas Tuscarora asserts that the closure orders and resulting losses were solely traceable to COVID−19. The closure orders implemented across the nation were in response to the transmission of COVID−19 and the desire of state and local governments to control the further spread of that virus. But those closure orders were not issued uniformly, or even consistently, based upon the extent that the coronavirus was present in each state. While Pennsylvania continued to impose complete or partial restrictions on business activities, other states such as Florida, Georgia, and Texas, which had comparable or greater per capita incidence of positive COVID−19 cases, allowed their businesses to operate without limitations or with significantly lesser constraints. In that respect, the closure orders, rather than the novel coronavirus itself, determined the gains or losses experienced by the businesses in those states. Although the parties did not raise the disparity in the various states' closure orders in their submissions, it is appropriate to consider that documented variability in determining whether the law states with certainty that COVID−19 was the proximate cause of [T]he Scranton Club's business losses.
>
> Tuscarora's virus exclusion lacks the anti−concurrent causation language contained in the insurance policies that were analyzed by the federal rulings cited by Tuscarora, as a result of which Tuscarora's demurrer may be sustained only if it is clear and free from doubt that, based upon the allegations of [T]he Scranton Club's complaint, the virus exclusion bars coverage as a matter of law. Such a conclusion would necessitate a definitive finding that

COVID–19, not the particular closure orders issued in Pennsylvania, was the proximate cause of [T]he Scranton Club's business losses. While those closure orders and the coronavirus may have been concurring causes of [T]he Scranton Club's business losses, it cannot be declared as a matter of law that the COVID–19 was the efficient proximate cause based upon the factual allegations of the complaint.

*Id.* at 27-28.

The "fact-specific proximate cause determination [could not] be made as a matter of law based upon [T]he Scranton Club's averments, and Pennsylvania law requires exclusionary clauses to be strictly construed in favor of the insured." *Id.* at 29. As such, we conclude that the court did not err in overruling Tuscarora's demurrer based upon the Virus Exclusion. *See id.* at 29.

In its second issue, The Scranton Club claims that the trial court erred in sustaining Tuscarora's preliminary objection as to its claim for coverage under the Civil Authority provision of the policy. Scranton's Brief at 40. Specifically, it argues it pled that access to the area immediately surrounding the property was prohibited by the Governor's orders and that a state of emergency existed throughout the Commonwealth. *Id.* at 42.

The Scranton Club further argues that issues of fact remained regarding whether COVID-19 damaged any property; was actually present at any property; and the extent to which the Governor's orders were issued in response to property damaged by COVID-19. *Id.* at 41. Consequently, The Scranton Club maintains that it pled sufficient facts to trigger coverage and

the trial court could not, as a matter of law, conclude that it did not establish the existence of coverage under this provision. ***See id.***

The trial court concluded that The Scranton Cub did not establish that coverage existed under the Civil Authority provision. The court stated that "coverage applies to a nearby property, other than [The Scranton Club's] premises, [which] sustains damage and access to the [its] property is prohibited as a result." Trial Court Opinion, 1/25/21, at 37. The trial court further observed that "[T]he Scranton Club [did] not allege in its complaint that a neighboring property was damaged by COVID-19 or a covered cause of loss, or that access to its own property was barred by a civil authority in response to dangerous conditions created by that adjoining property." ***Id.*** Because The Scranton Club did not allege facts to satisfy coverage requirements, the trial court concluded that coverage was unavailable and sustained Tuscarora's objection. We agree.

In its complaint, The Scranton Club alleged that the entire Commonwealth had been declared a disaster area due to COVID-19 and as such the Governor's orders required all entities to shut down unless they were a life-sustaining business. The Scranton Club further alleged that there was no evidence that the virus was present on its own property. From these allegations, it can be inferred that businesses and properties other than The Scranton Club were affected by COVID-19 and that, as a result, the authorities needed to prohibit access to The Scranton Club's property and business.

- 17 -

Therefore, The Scranton Club alleged that properties other than its own were involved.

However, for purposes of Civil Authority Coverage under the policy at issue here, the civil authority action prohibiting access to The Scranton Club's premises must be in response to "damage" caused to another property. That property must be "damaged" and there must be some ongoing "dangerous physical condition" stemming from the "damage" to the other property. The policy here does not provide for "direct physical loss of," only "damage." And, as discussed above, the definition of "damage" that this Court has applied for insurance coverage purposes and COVID-19 requires that there be some injury to the property. **_See Ungarean_**, 286 A.3d at 360. The Scranton Club did not allege that any neighboring properties sustained an injury as a result of the virus which resulted in its property being shut down. While these facts would have to be proven, The Scranton Club at least needed to allege these facts in its complaint to withstand preliminary objections, but it did not.[3]

We therefore conclude that the trial court did not err or abuse its discretion in determining that The Scranton Club did not establish a claim for coverage under the Civil Authority provisions of the insurance policy.

_____

[3] We note that, on the issue of Civil Authority Coverage, we reached a different conclusion than we did in **_Ungarean_**. There, the policy provided for such coverage where the civil authority action was due to "direct physical loss of or damage to," not only "damage" as provided for the policy issued by Tuscarora in this case. **_See Ungarean_**, 286 A.3d at 367.

- 18 -

In its third issue, The Scranton Club claims that, because the reasons for rejecting its insurance claims were not valid, the trial court erred in dismissing its claim for bad faith. Scranton's Brief at 43.

The trial court concluded that because coverage was not available, The Scranton Club could not establish a claim for bad faith. Based on our analysis of The Scranton Club's coverage issues, we disagree.

The trial court based its decision on the premise that, "where coverage does not exist, the insured is unable to state a bad faith claim on the ground that coverage was improperly denied." Trial Court Opinion, 1/25/21, at 41. While this is an accurate statement of the law, because we reversed the trial court on the coverage issues, the trial court was premature in sustaining Tuscarora's demurrer to The Scranton Club's claim for bad faith. In its complaint, The Scranton Club alleged that coverage existed under the policy and that Tuscarora's denial was "arbitrary, unreasonable and inconsistent with the facts and plain language of the policy and inconsistent with Pennsylvania law." Like the trial court, we must accept all allegations as true for purposes of preliminary objections. Therefore, we conclude that The Scranton Club's claim for bad faith should proceed at this juncture of the litigation.

In sum, we conclude that the trial court: 1) erred in sustaining Tuscarora's preliminary objection on the basis that The Scranton Club did not allege a "physical loss of or damage to" its property; 2) did not err in overruling Tuscarora's preliminary objection as to the Virus Exclusion; 3) did not err in sustaining Tuscarora's preliminary objection as to the Civil Authority

coverage under the policy; and 4) erred in sustaining Tuscarora's preliminary objection as The Scranton Club's bad faith claim.

Order reversed in part and affirmed in part.

President Judge Panella has joined. Judge Olson files a concurring statement.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/12/2023