**STATE of Maine**

v.

**Milton E. CHAPLIN, Jr.**

Supreme Judicial Court of Maine.

Aug. 16, 1973.

———◆———

Malcolm Lyons, Asst. Atty. Gen., Augusta, for plaintiff.

Wathen & Wathen by Daniel E. Wathen, Augusta, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEATHERBEE, Justice.

The Defendant was convicted of manslaughter after a jury trial in Kennebec County.[1] His appeal raises several issues only one of which it will be necessary for us to consider as it requires that we sustain his appeal.

The testimony disclosed that the Defendant and his now deceased wife were again living together on the second floor of an apartment house in Gardiner following a week's separation during which Mrs. Chaplin had instituted a divorce action. On the day of Mrs. Chaplin's death, she was heard screaming for a woman friend who lived on the first floor. A few moments later Mrs. Chaplin came out of the house assisted by the Defendant. She was bleeding from a knife wound in her abdomen and fell to the ground. There were no eyewitnesses to the stabbing. There and later at the hospital she made statements to the effect that the Defendant had stabbed her and indicating a fear of him. Her abdomen had been penetrated by the blade of a hunting knife, later found in the apartment, and she died soon after reaching the hospital. On being told of her death, the Defendant, then apparently very distraught, said that if he hadn't been jealous he wouldn't have done it.

During the presentation of the State's evidence the Presiding Justice asked a series of questions of a witness which form the basis of one of the Defendant's claims of error, and which will prove dispositive of this appeal.

The only detailed account of the stabbing came into evidence when the Defendant took the stand in his own behalf. He testified that he and Mrs. Chaplin had quarrelled intermittently most of the after-

---

1. Defendant had been indicted for murder. He had been tried on this charge and found guilty of manslaughter but his conviction was set aside on appeal and a new trial ordered. State v. Chaplin, 286 A.2d 325 (Me.1972).

noon and early evening during which time he had drunk eight cans of beer; that at one point early in the afternoon he went into the bedroom and got a hunting knife which he displayed telling her that he would kill himself if she didn't stop arguing; that he then put the knife in its sheath and stuck the sheath under the waistband of his trousers; that he then went to the barbershop and to a grocery store and then returned home where he argued with Mrs. Chaplin, drank and slept at intervals until shortly after 8:00 P.M. when he got up out of his chair to return the knife to the bedroom.

He testified that Mrs. Chaplin refused to kiss him and instead pushed him so that he dropped the knife which fell out of its sheath. He said when he stooped to pick up the knife Mrs. Chaplin tried to take the knife from him and was stabbed accidently.

Against this claimed factual background we will now examine the significance of the questioning by the Justice.

A State's witness, a Mrs. Thomas, had testified on cross examination that approximately two months before Mrs. Chaplin's death she had gone to the Chaplin apartment and had witnessed an incident during which Mrs. Chaplin had struck the Defendant for reasons not apparent to the witness. The witness said she had left the scene immediately after the blow was struck. The prosecuting attorney elected not to inquire further concerning the incident. The Presiding Justice then questioned the witness in the following manner:

"BY THE COURT:

Q. This incident that you refer to was somewhere around Easter time?

A. Yes, sir.

Q. Was there a period of time when Mrs. Chaplin was sporting a black eye?

A. Right after that she had black eyes.

Q. It was after this incident?

A. Yes, sir. I believe the black eyes were from this although I didn't stay to see it.

Q. The black eye you believe was from this particular altercation?

A. Yes but I didn't see it. I ran out.

Q. But it was right after this incident that you are talking about that Mrs. Chaplin had a black eye, is that correct?

A. Yes.

THE COURT: You are excused."

Defendant's counsel made no timely objection to this interrogation by the Justice as M.R.Crim.P., Rule 51 demands, and in no way brought to the attention of the Court the possible prejudice of the line of questioning which the Justice was pursuing.

■ We said in State v. Rowe, Me., 238 A.2d 217, 225 (1968), while considering a somewhat similar claim of error:

"Where no objection is made at the time to judicial language or conduct thought to be prejudicial to the rights of the accused so that corrective measures may be adopted to remedy the situation or protect the defendant against unfavorable inferences, this Court will not consider the alleged error on appeal and grant a new trial except in circumstances where the error at trial was so highly prejudicial and calculated to result in injustice that an unjust verdict would inevitably result or when it is apparent from a review of all the record that the accused has not had the impartial trial to which under the law he is entitled. Attorneys for respondents, even though court appointed, have the duty of protecting and preserving their clients' rights in every legitimate way. They must do so as the case progresses subject to the application of the waiver rule if they do not. However, this Court

in a criminal case will not refuse to review the record to determine whether the fundamental rights to a fair trial have been accorded the accused. . . ."

This test for reversible error based upon alleged prejudicial conduct of a presiding justice to which no objection was made is the same one which we have applied to other types of error which were not brought to the Court's attention in State v. McKeough, Me., 300 A.2d 755 (1973) and State v. Collins, Me., 297 A.2d 620 (1972). M.R.Crim.P., Rule 52(b). The factors may differ in each case.

We have frequently recognized the difficulties faced by Superior Court Justices in carrying out their awesome trial responsibilities, especially when the trial of a criminal case is to a jury. Although the Justice is expected to be more than a mere observer at the trial his participation in the questioning of witnesses, while sometimes necessary to insure the attainment of justice, must be conducted with caution lest it carry an unfair impact upon the jury.

The trial judge's responsibilities were succinctly stated by the late Chief Justice Fellows in State v. Dipietrantonio, 152 Me. 41, 48–49, 122 A.2d 414, 419 (1956):

"A justice who presides over a jury trial occupies a place of great responsibility. He must not only see that a dignified order is maintained in the court room and that the procedure is according to rule and statute, but also that the rights of all parties are protected. In a civil case he must hold the 'scales' evenly. In a criminal case he must protect the constitutional rights of a respondent, and at the same time remember that the public is also entitled to protection. A trial in a court of justice is not arranged for the purpose of testing the respective abilities of the attorneys involved upon the one side or the other. The purpose of a trial is to determine what is the truth, and what is justice under the facts and the law, and to that end the trial judge is not only permitted but it is his duty to participate directly in the trial to facilitate its orderly progress, in order to elicit the truth and to administer justice. His remarks or conduct in performing this duty will not constitute error if they are such as do not discriminate against or prejudice either party in a civil proceeding, or to prejudice the constitutional rights of an accused in a criminal case. Improper remarks may usually be cured by cautioning the jury, or by correcting at the time, or by instructing in his charge not to consider them. He must admonish counsel if occasion demands and caution witnesses, but he must do so in a manner not to create a prejudice or to indicate an opinion on the facts. It is always permissible for the court, and, if it appears necessary for him to do so, it is his duty to propound to witnesses such questions as he deems necessary to bring out any relevant and material evidence, without regard to its effect, whether beneficial to one party or the other. He should remember that he is not employed as one of the attorneys, however, and should not engage in an extended examination, or cross examination unless necessary. The examination of a witness by the presiding judge must be conducted without prejudice to an accused, and in such a manner as to impress the jury that the judge is impartial and is not indicating his opinion on the facts. . . ."

14 M.R.S.A. § 1105 also prohibits the presiding justice from indicating to the jury any opinion upon factual issues arising in the case.

In the present case the Justice had participated carefully with counsel in the scheduling of the presentation of evidence in order to avoid the disclosure of facts which had been revealed erroneously at the first trial and which, because of this Court's decision on Defendant's appeal, were now inappropriate for the jury's hearing. The admirable caution which he had exercised in assuring protection of the De-

fendant from prejudicial testimony was marred only by the single instance quoted.

Our evaluation of the effects of the questioning by the Justice in this case involves problems which distinguish it from other instances of alleged judicial error which we have been called upon to examine in which we have found no prejudice in the questioning.[2]

The Justice's question, "Was there a period of time when Mrs. Chaplin was sporting a black eye?" in the context in which it was asked, was a leading question. If it had been put to the witness by the prosecuting attorney, it would have been the Justice's duty to have excluded it upon objection. While the policy considerations against permitting leading questions on direct examination by partisan counsel do not apply to the judge whose function is to be impartial, when a leading question is asked by the judge it carries grave danger that it may imply that the judge believes that the suggested answer is the truth. 2 C. Torcia, Wharton's Criminal Evidence, § 407, at 287 (13th ed. 1972); C. McCormick, Law of Evidence, at 12–14 (1954); Annotation 84 A.L.R. 1214.

Furthermore, the question resulted in a reply by the witness which was incompetent to prove the issue now suggested by the questioning—that is, whether the black eyes were the product of subsequent assault by the Defendant. This question, too, would have been excluded upon objection. The prejudicial effect of the witness's incompetent observation was multiplied by the Justice's next question which led her to repeat it and it was then further emphasized by his last question.

■ This questioning by the Justice introduced into the trial an entirely new area of evidence—that of prior violence by the Defendant against the wife. We accept the statement of the text writer in 58 Am.

Jur. Witnesses § 557 as generally applicable to such situations:

". . . [I]t is improper for a judge . . . by his questions to seek the development of facts which are not suggested by the evidence given on the trial and which but for his interference may remain undeveloped. . . ."

A similar conclusion of appellate judicial disapproval of a judge's introduction of a new field of inquiry is expressed by the writer of a lengthy annotation on the subject in 84 A.L.R. 1172, 1212:

"It is generally held improper for a trial judge to propound questions the effect of which is to bring out facts which have not theretofore been the subject of any testimony."

The witness's statement of opinion linking the Defendant with his wife's black eyes was (except for Defendant's somewhat ambiguous remarks to the police and his later testimony on cross-examination) the only evidence which the State presented which revealed any propensity to violence on Defendant's part toward his wife. The Defendant's claim that his wife was stabbed by accident made the existence of intent by the Defendant to do violence to his wife the vital issue in the case. Evidence that he had inflicted injuries on her some two months before doubtless was recognized as significant by the jury. (Later, the Defendant took the stand and admitted on cross-examination that he had in fact struck his wife on more than one occasion but we realize that his decision to testify may have been influenced by the earlier introduction of this damaging testimony.)

The conclusion seems inescapable that the fact that this incident of violence was introduced into the case by the Justice doubtless carried to the jury the impression that the Justice believed that the witness's opinion that the Defendant had struck his

2. State v. Haycock, Me., 296 A.2d 489, 492 (1972); State v. Rowe, supra; State v. Vashon, 135 Me. 309, 196 A. 88 (1938); State v. Priest, 117 Me. 223, 231, 103 A. 359, 363 (1918).

wife after the witness had departed was highly significant and worthy of the jury's particular consideration.

The effect of such an intervention by a Justice must be evaluated according to the circumstances of each case. In this case we are constrained to hold that the error was seriously prejudicial tending to produce manifest injustice.

The entry will be:

Appeal sustained.

New trial ordered.

All Justices concurring.

WEBBER, J., sat at oral argument but retired before the adoption of this opinion.