**STATE of Maine**

**v.**

**Mark W. ANNIS.**

Supreme Judicial Court of Maine.

July 9, 1975.

---

Joseph M. Jabar, Dist. Atty., Augusta, Charles K. Leadbetter, Foahd J. Saliem, Asst. Attys. Gen., Augusta, for plaintiff.

Wathen & Wathen by Malcolm L. Lyons, Augusta, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

PER CURIAM.

The defendant was convicted of sale of cannabis after jury trial in Kennebec County. We need to discuss only one of the several issues raised on appeal. We sustain his appeal.

The State had presented a young undercover agent for the Augusta Police Department who testified that he met the defendant and another young man named Moore (whose case is not before us) in the evening on the second floor of the recreational center at the Augusta State Mental Institute. He said he asked Mr. Moore, in the defendant's presence, to sell him marijuana. Mr. Moore answered "Sure," and the three went down the stairs and out of the building to an automobile parked at the curb. He testified that Mr. Moore got into the car, sitting behind the steering wheel and the agent sat in the passenger seat, leaving the door on the passenger side open. The defendant stood between the open door and the car, leaning somewhat into the car while Mr. Moore took marijuana from the glove compartment and gave it to the agent. The agent said that the defendant then requested, and received from him, the payment for the marijuana.

The defendant testified that he had gone to the recreational building with Mr. Moore that night and was playing pool with a Mr. Simpson when he saw Mr. Moore and the agent leave the building together. He said that four or five minutes later he went outside and found Mr. Moore and the agent sitting in Mr. Moore's car. He stood by the car three or four minutes talking with them, and, on learning that Mr. Moore was leaving, he went back into the building with his pool opponent who had appeared on the scene. He denied hearing conversation about marijuana in the building, going out of the building with Mr. Moore and the agent, seeing any marijuana changing hands in Mr. Moore's car, or receiving any money from the agent.

The State was obviously aware of the significance of the defendant's testimony that he was, in fact, present for a time beside the automobile where the agent had testified the sale of the drug took place and the State's attorney cross-examined the defendant as to his ability to see and hear what was transpiring in the car. Later, on cross-examination by the attorney for Mr. Moore, the defendant reiterated his brief presence beside the car during part of the time Mr. Moore and the agent were seated inside it.

On cross-examination by the State, the defendant said he did not obtain Mr. Simpson's presence as a witness because he had learned of the trial date only the previous evening and did not know how to locate Mr. Simpson. The State's attorney cross-examined him as to this, also.

Following this cross-examination, the presiding Justice undertook an extensive examination of the defendant in which he asked the defendant a series of some 45 questions concerning the incident at the car and defendant's failure to produce Mr. Simpson as a witness. At the conclusion of the Justice's interrogation, defendant's

attorney moved, unsuccessfully, for a mistrial.

The persistent quality of the questions disturbs us more than their number.[1]

1. "THE COURT: Did I understand you to say in answer to a question by Mr. Barr that you didn't hear them talking, that you were looking through the windshield? A Well, what he had asked me, he said if I had heard him say anything, if I was close enough where I could hear them say anything, and I told him no, because at the time I was talking to Jim, and they weren't talking to each other.
THE COURT: Yes, but just prior to that, you said you didn't hear what they were saying, you were looking through the windshield. Didn't you say that?
A No, sir.
THE COURT: You didn't say that?
A No.
THE COURT: I misunderstood then.
A I said that I was talking toward the windshield. He asked me if I had seen any transaction, and I told him 'no'.
THE COURT: But you did see them in the car?
A Yes, I did.
THE COURT: You were out there?
A Yes, I was.
THE COURT: You don't know what was going on, you say?
A I went downstairs to find out where he was going.
THE COURT: And they were in the car?
A Yes.
THE COURT: And you were there at the car?
A Yes, I was.
THE COURT: Was there anyone else with you?
A Tim Simpson was standing on the porch. He came down a couple of minutes after me.
THE COURT: Tim Simpson came down a couple of minutes after you?
A Yes.
THE COURT: So there was a time when just the three of you were there? Is that correct?
A Yes.
THE COURT: And where was Mr. Moore?
A In the driver's seat.
THE COURT: In the driver's seat?
A Yes.
THE COURT: And where was Mr. Bellemore?
A In the passenger side.
THE COURT: And where were you?
A Outside the car.
THE COURT: Which side? The passenger side, or the driver's side?

A The passenger side, in front of the door.
THE COURT: On the passenger's side, in front of the door?
A Towards the front of the hood of the car, 'cause there's a drop-off where the car was parked.
THE COURT: And then sometime after that, Mr. Simpson came down?
A Yes.
THE COURT: So that there was, no question in your mind, there was a time when just the three of you were there before Mr. Simpson came?
A Right.
THE COURT: And you saw no transaction?
A No, I didn't.
THE COURT: And you did not participate in a transaction?
A No.
THE COURT: And you didn't know what they were doing in a car?
A No, I did not. For all I knew he could have been asking him for a ride some place.
THE COURT: You saw them go out together?
A Yes, I did.
THE COURT: And as they started out didn't it occur to you to ask them where they were going?
A Well, I was with Mr. Simpson, I told him to wait a minute and I went down a few minutes after they went down.
THE COURT: And this Mr. Simpson lives in Augusta, you say?
A I think he does, to my knowledge.
THE COURT: When were you notified to be here today?
A Last night.
THE COURT: What time?
A I got the message about 4 o'clock, or 3 o'clock.
THE COURT: Three, four, or five o'clock in the evening?
A Yes. And I was in Poland, and I had no transportation at the time.
THE COURT: What time did you come into town this morning?
A Well I had my friend—I finally made it in around ten o'clock, I guess it was, and I stayed at his place, and I came in this morning.
THE COURT: You made it in about ten o'clock last night?
A Ya, someone give me a ride last night. Jim Moore.
THE COURT: Last night?
A Right.
THE COURT: You were at Jim Moore's last night?
A At Monmouth, yes, sir.

We have frequently recognized that a trial judge must be more than an impartial referee and that, on occasion, he is required to participate in the interrogation of witnesses to prevent a miscarriage of justice, such as to clarify confused evidentiary situations or to bring forward overlooked essential facts.[2] In State v. Hunnewell, Me., 334 A.2d 510, 512 (1975) we recognized that

"[i]t is not always easy for the Justice presiding at a jury trial, conscientiously attempting to clarify evidentiary problems for the jury's benefit, to recognize the point at which his cumulated judicial efforts begin to suggest to the jury that the Justice has aligned himself on the side of one of the contestants."

In *Hunnewell*, although we were disturbed by the extensiveness of the Justice's questioning of the State's witnesses, we concluded that, as it was largely concerned with clarifying admissibility requirements and probative validity of prison records, it was harmless in view of the undisputed evidence of the defendant's unlawful absence from prison. We are faced here with a situation which has much greater potential for prejudice.

The witness was the defendant himself and the repetitive questioning bore directly upon his credibility. The defendant had already agreed several times, on both direct and cross-examination, that he was present at the automobile with the undercover agent and Mr. Moore—a fact which was likely to have added credence to the testimony of the State's principal witness. The situation required no further testimonial clarification. The defendant had also been cross-examined by the State's attorney concerning his failure to locate Mr. Simpson.[3] The series of persistent questions by the Justice, several of them in language more of a prosecutorial

THE COURT: Did you talk to him about coming to Court today?
A No, I did not. Just about coming in. We were trying—
THE COURT: You talked with him about both of you coming to Court today, didn't you?
A Ya, I did.
THE COURT: Did either one of you talk about getting a hold of Tim Simpson, bringing him in?
A Yes, we did.
THE COURT: Did you come into town looking for him last night?
A We tried calling, but we couldn't get hold of him.
THE COURT: Where did you try to call?
A Well, I really didn't try that hard, 'cause the last time I heard that he was in the county jail, and my lawyer was going to subpoena him to come to court today.
THE COURT: When did your lawyer tell you that?
A This morning. And I went out this morning to look for him. This afternoon, I mean.

THE COURT: You went out to look for him?
A Yes, I did.
THE COURT: Where did he go?
A Just around to his girl friend's, to Rap and Rescue, and down to the park.
THE COURT: And you didn't find him?
A No.
THE COURT: Did you find out where he is?
A No, we did not.
THE COURT: So as far as you know he is not available?
A Not at present, no."

2. State v. McKeough, Me., 300 A.2d 755 (1973); State v. Chaplin, Me., 308 A.2d 873, 875 (1973); State v. Haycock, Me., 296 A.2d 489, 492 (1972); State v. Rowe, Me., 238 A.2d 217 (1968); State v. Dipietrantonio, 152 Me. 41, 122 A.2d 414 (1956).

3. After the questioning by the Justice, it was stipulated that the Sheriff, at defendant's attorney's request, had made an unsuccessful attempt to locate Mr. Simpson.

than an inquiring nature, must certainly have suggested to the jurors that the Justice was assisting the State in emphasizing that particular fact situation. It is likely that it also suggested that the Justice entertained doubts as to the defendant's veracity.

While the defendant's counsel should have made known to the Justice his concern over the possible prejudicial effect of the Justice's questioning earlier than he did, we are satisfied that, however well intentioned the interrogation was, its cumulative impact amounted to manifest error.

The entry must be:

Appeal sustained.

Remanded to the Superior Court for retrial.